

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Antonio Rodríguez Pagán<br><br>Recurrido | Certiorari<br><br>2011 TSPR 92<br><br>182 DPR _____ |

Número del Caso:   CC          - 2009 - 314

Fecha: 17 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de Ponce, Panel X

Juez Ponente:        Hon. Troadio González Vargas

Oficina de la Procuradora General:

Lcda. Mayra J. Serrano Borges
Procuradora General Auxiliar

Lcda. Zaira Z. Girón Anadón
Subprocuradora General

Abogado de la Parte Recurrida:

Lcdo. Luis E. Rodríguez Santiago

Materia:      Asesinato en Primer Grado y Artículo 5.15

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público                              a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
        Peticionario

                                        *Certiorari*

            v.                          CC-2009-314

    Antonio Rodríguez Pagán
          Recurrido


Opinión del Tribunal emitida por la Jueza Asociada SEÑORA FIOL MATTA


En San Juan, Puerto Rico, a 17 de junio de 2011.

Este caso nos brinda la oportunidad de examinar los efectos jurídicos de la equivocación respecto a la víctima del asesinato en nuestro ordenamiento penal. En particular, debemos considerar si el elemento de deliberación necesario para sostener una convicción de asesinato en primer grado es atribuible al sujeto activo cuando la víctima interviene en el ataque y recibe el golpe mortal dirigido a otra persona. Por las razones que expondremos a continuación, revocamos la Sentencia del Tribunal de Apelaciones que modificó la convicción original de asesinato en primer grado a segundo grado y restituimos la convicción original.

I.

En la noche del 29 de noviembre de 2004, una veintena de jóvenes se encontraban jugando en la cancha de baloncesto del sector Quebrada del Agua de Ponce. Entre ellos estaban Fernando Rodríguez Muñiz y Héctor Luis Mejías Sánchez. Mientras jugaban, el señor Rodríguez Muñiz se percató de que dos personas, que no pudo identificar en la lejanía, se acercaban a la cancha cruzando por el parque de pelota aledaño cuyas luces estaban apagadas. Cuando estas personas entraron a la cancha, el señor Rodríguez Muñiz las reconoció e identificó en el juicio como el señor Antonio Rodríguez Pagán y su padre, el señor Antonio Rodríguez González, ambos vecinos de la comunidad. Incluso, la vivienda de éstos colindaba con el parque de pelota por el cual cruzaron para adentrarse a la cancha de baloncesto. Cuando la pareja se les acercó, el señor Rodríguez Muñiz les dijo: "¡Eh!, vamos a hablar por los problemas de ayer".[1] Acto seguido, el señor Rodríguez González se vira, saca un arma que tenía consigo y dispara contra el señor Rodríguez Muñiz. Éste logró esquivar el disparo y se tiró al piso.[2] Inmediatamente después, el señor Rodríguez Muñiz se levanta

---

[1] Transcripción del juicio, p. 201; anejo petición de *certiorari*, p. 252.

[2] Aunque no surge con claridad del expediente, aparentemente hubo un intercambio de palabras soeces entre Rodríguez González y Rodríguez Muñiz. *Id.*, p. 212; anejo petición de *certiorari*, p. 263. En varias ocasiones durante el juicio y particularmente durante el testimonio del señor Rodríguez Muñiz, el abogado de defensa intentó incluir alegaciones hechas por los acusados contra este testigo por supuestos actos de escalamientos que éste había realizado en la vivienda de ellos. *Id.*, p. 226-228; anejo petición de *certiorari*, p. 277-279.

y le dice al señor Rodríguez González: "¡Ah!, si la sacaste y la usaste ahora vas a tener que matarme". El señor Rodríguez Muñiz comenzó a caminar hacia el frente en dirección del señor Rodríguez González. Durante este intercambio, los señores Rodríguez Pagán y Rodríguez González comenzaron a caminar en dirección de su casa. Mientras el señor Rodríguez Muñiz se acercaba al señor Rodríguez González, el hijo de éste, Antonio Rodríguez Pagán, quien ya se encontraba dentro del patio de la casa, sacó un arma que llevaba consigo y disparó dos veces corridas contra el señor Rodríguez Muñiz a una distancia de entre diez a quince pies.[3] No obstante, el señor Héctor Luis Mejías Sánchez logró empujar al señor Rodríguez Muñiz exclamando "¡Nandito, cuidado, cuidado!". Uno de los disparos alcanzó al señor Mejías Sánchez mientras éste echaba hacía el lado al señor Rodríguez Muñiz. Después de ser llevado al hospital, el señor Mejías Sánchez falleció el 3 de diciembre de 2004 a los 22 años de edad.

Poco después del incidente, llegó a la escena el policía Miguel Colón Dávila para investigar una querella sobre detonaciones en el área y la posibilidad de que hubiera un herido de bala. Al llegar al parque de pelota, se encontró con un grupo de personas allí reunidas. Dirigiéndose al grupo, el agente Colón Dávila les informó que estaba investigando una querella y algunos de los

---

[3] No surge con exactitud del testimonio del único testigo presencial, el señor Rodríguez Muñiz, si fue uno o si fueron dos disparos.

presentes le indicaron que se dirigiera a la casa de los acusados. Al entrar a la residencia, el agente preguntó si alguien había escuchado algo relacionado con los incidentes en el parque. El señor Rodríguez Pagán le expresó "yo fui el que disparé".[4] Acto seguido, el agente Colón Dávila le leyó sus derechos y lo arrestó. Además, le pidió que le enseñara el arma de fuego que utilizó. El señor Rodríguez Pagán le mostró y entregó una pistola Glock calibre 45. Poco después, el señor Rodríguez González admitió que él también había disparado "al aire" y, tras ser advertido de sus derechos, le hizo entrega al policía de su revólver calibre 357. Además de esta evidencia, posteriormente la policía recuperaría dos casquillos de bala en el patio de la vivienda de los acusados que daba directamente al parque de pelota.

Padre e hijo fueron acusados por asesinato en primer grado actuando en concierto y común acuerdo. El juicio se ventiló ante un tribunal de derecho. Además del agente Colón Dávila y del señor Rodríguez Muñiz, por el Pueblo también testificaron los agentes Orlando Echevarría Figueroa, Omar López Rodríguez y Carlos Rivera Pérez, así como las doctoras Rosa M. Rodríguez Castillo y María Vázquez. Del testimonio de éstos surge que la bala extraída al señor Mejías Sánchez pertenecía a la pistola Glock

---

[4] *Id.*, p. 173; anejo petición de *certiorari*, p. 224.

calibre 45 que el señor Rodríguez Pagán entregó al agente Colón Dávila.[5]

Por la defensa únicamente testificó el señor Pedro Luis Pérez Torres como testigo de reputación. Éste declaró que los acusados le daban servicio de fumigación a su negocio y que eran personas muy responsables y tranquilos, que tenían muchas amistades y eran personas muy buenas en la comunidad. Tras las argumentaciones finales por la fiscalía y los abogados de defensa, el Tribunal de Primera Instancia encontró culpable al señor Rodríguez Pagán de asesinato en primer grado y, por tener duda razonable, absolvió al señor Rodríguez González.[6] El foro de instancia sentenció al señor Rodríguez Pagán a 99 años por asesinato en primer grado y a 5 años por Ley de Armas a ser cumplidas de manera consecutiva.

Inconforme con el fallo del Tribunal de Primera Instancia, el señor Rodríguez Pagán recurrió al Tribunal de Apelaciones. En lo pertinente, alegó que el foro primario incidió en su apreciación de la prueba y que no se probó su culpabilidad más allá de duda razonable. Un panel del foro

---

[5] Esto surge, en particular, del testimonio del agente Carlos Rivera Pérez, examinador de armas de fuego y marcas de herramienta de la Sección de Armas de Fuego en el Instituto de Ciencias Forenses. De los casquillos recuperados del patio de la vivienda de los acusados, uno pertenecía al revólver 357 del señor Rodríguez González y el otro a la pistola Glock calibre 45 del señor Rodríguez Pagán. De los testimonios de la Dra. Rodríguez Castillo y el agente Echevarría Figueroa surgen cuestionamientos relacionados con la cadena de custodia de parte de la evidencia.

apelativo resolvió por mayoría, y en su sentencia manifestó lo siguiente: "[S]entimos en nuestra conciencia una perturbadora intranquilidad con respecto a la configuración del asesinato en su modalidad de primer grado".[7] En efecto, el Tribunal determinó que "no se configuraron los elementos esenciales para la comisión de delito de asesinato en primer grado" por haber "duda razonable para la configuración de la referida modalidad del asesinato perpetrado".[8] En particular, el foro apelativo no quedó convencido de que se probara el elemento de deliberación que era necesario para sostener el fallo de culpabilidad de asesinato en primer grado.[9] Específicamente manifestó que "no se probó que el apelante, fría y calculadamente, disparara alevosamente en ánimo de ultimar a balazos a la víctima".

Inconforme con esta determinación del Tribunal de Apelaciones, la Procuradora General acudió ante este Tribunal alegando que el foro intermedio había errado al modificar la Sentencia del Tribunal de Primera Instancia en cuanto al grado del asesinato. El Estado alega que el caso de autos se trató "de un asesinato pensado, planificado y deliberado" lo que demuestra la existencia de una intención

---

[6] También pesaba contra el señor Rodríguez Pagán un cargo de Ley de Armas.

[7] Sentencia del Tribunal de Apelaciones, p. 15; anejo petición de *certiorari*, p. 41. La jueza Feliciano Acevedo disintió sin opinión escrita.

[8] *Id.*, pp. 17-18; anejo petición de *certiorari*, pp. 43-44.

[9] *Id.*, p. 19; anejo petición de *certiorari*, p. 45 (Énfasis suplido).

específica de matar.[10] En particular, argumenta que el foro apelativo "entró en consideraciones sobre los elementos subjetivos del delito que propiamente le compete inferir de los hechos al juzgador".[11] Aduce además que el recurrido incurrió en una conducta fría y calculada como lo demuestra el que acudiera armado junto a su padre a la cancha de baloncesto, que dispararan sus armas de fuego a corta distancia de sus blancos y que ambos la emprendieran a tiros contra el señor Rodríguez Muñiz.[12] En síntesis, expone el Estado que la prueba demuestra que el señor Rodríguez Pagán llegó a la cancha decidido a matar.[13] El 27 de abril de 2009 expedimos el auto de *certiorari*. Resolvemos.

II.

Como los hechos de este caso sucedieron antes de la vigencia del actual Código Penal, iniciamos nuestra discusión analizando las disposiciones pertinentes del Código Penal de 1974. Ese Código definía el delito de asesinato de la siguiente manera: "Asesinato es dar muerte a un ser humano con malicia premeditada".[14] Por su parte, el

---

[10] Petición de *certiorari*, p. 4.

[11] *Id.*, p. 5.

[12] Como evidencia de esto, la Procuradora General hace referencia a que ambos acusados se encontraban tranquilamente en su casa, admitieron los hechos al ser abordados por el agente Colón Dávila e hicieron entrega de sus respectivas armas de fuego.

[13] Petición de *certiorari*, p. 11.

[14] Artículo 82 del Código Penal de 1974, 33 L.P.R.A. § 4001.

artículo 83 del mismo Código establecía los diferentes grados en los que se dividía dicho delito:

> Constituye asesinato en primer grado:
>
> (A) Todo asesinato perpetrado por medio de veneno, acecho o tortura, <u>toda clase de muerte alevosa, deliberada y premeditada</u>, o cometida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga.
>
> [...]
>
> Todos los demás asesinatos serán considerados de segundo grado.[15]

No obstante la división en dos grados, el asesinato es, bajo el Código anterior y el actual, un solo delito.[16] En ambos casos, se trata de un delito cometido intencionalmente,[17] pues el asesinato "es un delito que, por su definición y naturaleza, conlleva un acto perverso,

---

[15] <u>33 L.P.R.A. § 4002</u> (Énfasis suplido).

[16] <u>Pueblo v. Negrón Ayala</u>, 171 D.P.R. 406, 418 (2007). Según nos explica el profesor Cifredo Cancel: "La historia indica que el desarrollo de la figura del asesinato en segundo grado en el *common law* fue motivado por el deseo de limitar la severidad de la pena (pena de muerte) aplicable al 'murder' (asesinato). En sentido contrario, en la tradición civilista el desarrollo de la figura del dolo eventual fue motivado por el deseo de justificar la aplicación de una pena más severa a aquellos actos en que, por una parte, no aparece la clara voluntad del autor respecto del resultado, y en que, no obstante y por otra parte, parece que en muchos casos un castigo por imprudencia es insuficiente, que lo que el autor ha merecido es ser castigado por delito doloso". Félix Cifredo Cancel, *Contestación a tres problemas de Derecho Penal: Delitos contra la honestidad, asesinato, secuestro*, 62 Rev. Jur. U.P.R. 127, 135 (1993).
[17] El artículo 7(19) del Código Penal de 1974 definía 'malicia' como un acto dañoso intencional.

malintencionado y contrario a los valores éticos y morales de nuestra sociedad".[18]

Como se desprende del texto del Código de 1974, la "malicia premeditada" es un elemento mental requerido en el delito de asesinato independientemente de si es de primer o segundo grado.[19] La diferencia en la intención entre uno y otro grado es el elemento de la deliberación. Es decir, la resolución o decisión de matar, después de darle alguna consideración al acto.[20] Este elemento de deliberación se refiere a la decisión formada como resultado de pensar y pesar cuidadosamente las consideraciones en pro y en contra del propuesto curso de acción.[21] Ahora bien, cualquier periodo de tiempo, por corto que sea, será suficiente para que pueda tener lugar la deliberación. Incluso, hemos sostenido que ese lapso de tiempo puede ser tan rápido como el pensamiento.[22]

En el presente caso, el elemento de deliberación debe analizarse a la luz del artículo 15 del Código Penal de 1974 que ofrece la siguiente definición de la intención:

> El delito es intencional:
>
> (a) Cuando el resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión;

---

[18] Pueblo v. Negrón Ayala, *supra*, pp. 418-419.

[19] Pueblo v. Rodríguez Vicente, 173 D.P.R. 292, 301 (2008).

[20] Pueblo v. Negrón Ayala, *supra*, p. 419.

[21] Dora Nevares-Muñiz, Código Penal de Puerto Rico revisado y comentado (1986), p. 141.

[22] Pueblo v. Rodríguez Vicente, *supra*, p. 301.

(b) Cuando el resultado sin ser querido ha sido previsto o pudo ser previsto por la persona como consecuencia natural o probable de su acción u omisión.[23]

Como puede observarse, para cometer el delito de asesinato de acuerdo al Código de 1974 se requería únicamente que el sujeto activo actuara con la intención del artículo 15(a) ó 15(b) antes citado. La intención recogida en el artículo 15(a) se conoce como intención específica mientras que el artículo 15(b) recoge la figura de la llamada intención general.[24]

En el primer supuesto la persona tiene un deseo específico de efectuar el acto y quiere producir el resultado, ratificándolo con su actuación.[25] Por su parte, la intención general, un concepto proveniente del derecho común anglosajón, se basa en que "toda persona es responsable por las consecuencias naturales y probables de sus actos".[26] Es decir, que sin querer el resultado, sabe o debe saber que éste es consecuencia necesaria de su conducta y, no obstante ello, la lleva a cabo.

Hemos resuelto que cuando se hace referencia al elemento de la deliberación como requisito para la comisión del delito de asesinato en primer grado ello equivale a que

---

[23] 33 L.P.R.A. § 3062.

[24] Nevares-Muñiz, Código Penal, *Op.Cit.*, pp. 28-29. Véase además Dora Nevares-Muñiz, Derecho Penal Puertorriqueño, Quinta Edición (2005), p. 193.

[25] Nevares-Muñiz, Código Penal, *Op.Cit.*, p. 28.

[26] Nevares-Muñiz, Derecho Penal, *Op.Cit.*, p. 194.

el sujeto activo haya tenido la intención específica de matar.[27]

Se trata, pues, de un elemento subjetivo adicional a la intención criminal recogida en el artículo 15, que es la requerida para todo delito intencional.[28] Entonces, la deliberación equivale a "una reflexión adicional, realizada fríamente luego de darse la premeditación".[29] Mientras, en el delito de asesinato en segundo grado, basta la intención de realizar un acto o producir un grave daño corporal que con toda probabilidad resultaría en la muerte de una persona.[30]

---

[27] Pueblo v. Negrón Ayala, *supra*, p. 419; Pueblo v. Robles González, 132 D.P.R. 554, 563 (1993). Para explicar la diferencia entre la intención específica del artículo 15(a) y la intención general recogida en el artículo 15(b), la profesora Nevares-Muñiz recurre, precisamente, al ejemplo del asesinato. Nos dice la profesora:

> El asesinato en primer grado requiere que se pruebe el acto deliberado y premeditado que claramente demuestre que quiso y se previó la muerte de la víctima. Ello equivale a demostrar la intención específica de matar. En cambio, en el asesinato en segundo grado, basta la malicia premeditada, refiriéndose a la intención de realizar un acto dañoso, sin justa causa o excusa, que probablemente podría resultar en la muerte, como en efecto sucedió, pero sin que el acto haya tenido el propósito directo, específico y deliberado de matar.

Nevares-Muñiz, Derecho Penal, *Op.Cit.*, p. 194.

[28] Cifredo Cancel, *Op.Cit.*, p. 167.

[29] Nevares-Muñiz, Código Penal, *Op.Cit.*, p. 141.

[30] Pueblo v. Negrón Ayala, *supra*, p. 419, Pueblo v. Rosario, 160 D.P.R. 592, 610 (2003); Pueblo v. Ocasio Hernández, 139 D.P.R. 84, 91 (1995, Sentencia).

La intención específica de matar, según definido por el artículo 15(a) del Código Penal de 1974, es un elemento subjetivo adicional a la intención cuya existencia, en la mayoría de los casos, sólo podrá ser determinada mediante una inferencia razonable de los hechos.[31] Entre los elementos que se tomarán en consideración para determinar si se ha actuado con deliberación se encuentran los actos y las circunstancias que rodean la muerte, la relación entre las partes, la capacidad mental del autor, la motivación, las manifestaciones y conducta del acusado, así como los hechos anteriores, concomitantes y posteriores al crimen.[32] Es un asunto que le corresponde, en primera instancia, al juzgador de los hechos.

Coincidimos con la sala de instancia de que en este caso está presente el elemento de la deliberación. La Opinión concurrente invita a terminar aquí nuestro análisis. Sin embargo, nuestro examen del expediente, incluyendo la transcripción del testimonio del testigo principal, el señor Rodríguez Muñiz, deja meridianamente claro que el señor Rodríguez Pagán no disparó apuntando a la víctima, el señor Mejías Sánchez. Más bien, la intervención de la víctima produjo que ésta recibiera el disparo. La deliberación se produjo, por tanto, respecto al señor Rodríguez Muñiz, pero quien falleció fue el señor

---

[31] Pueblo v. Rodríguez Vicente, *supra*, p. 301.

[32] Pueblo v. Negrón Ayala, *supra*, p. 420. Sobre los hechos anteriores, concomitantes y posteriores como factores a

Mejías Sánchez y nos corresponde analizar si esa realidad conlleva alguna consecuencia jurídica en cuanto a la existencia de deliberación.

En nuestro ordenamiento, el error por parte del sujeto activo puede eximirle de responsabilidad penal. Bajo el Código de 1974, esta figura estaba recogida en los artículos 17 y 19. El primero se refería al error sobre la persona.[33] El segundo al error de hecho.[34]

El error en la persona recogido en el artículo 17, que proviene de la doctrina del derecho norteamericano conocida como intención transferida, no exime de responsabilidad penal pues la intención criminal del sujeto activo, dirigida contra determinado sujeto pasivo, se traslada a la persona que en efecto recibió el injusto.[35] Es decir, la

---

considerarse, véase <u>Pueblo v. Torres Nieves</u>, 105 D.P.R. 340, 346 (1976).

[33] "Cuando por error o por algún otro accidente se comete delito en perjuicio de persona distinta, su autor incurrirá en la misma responsabilidad que si hubiere cometido el acto en perjuicio de la persona contra quien dirigió su acción". Como veremos más adelante, la doctrina civilista divide esta modalidad del error entre error en la persona y error en el golpe.

[34] "No incurre en responsabilidad la persona cuya acción u omisión respondiere a un error esencial de hecho que justifique la ausencia de toda intención o negligencia". Esta causa de exclusión de responsabilidad penal tiene dos requisitos fundamentales: (1) que la conducta del sujeto activo incurra en un error de naturaleza esencial del hecho y (2) que sea invencible, entiéndase, que se niegue cualquier intención o negligencia criminal en la conducta del autor. El error puede recaer sobre elementos constitutivos del delito, también denominado error sobre el tipo o puede recaer sobre la antijuricidad de la conducta, también conocido como error de prohibición. Nevares-Muñiz, <u>Código Penal</u>, *Op.Cit.*, p. 35.

[35] *Id.*, p. 32.

intención criminal dirigida contra el blanco original se atribuye al sujeto activo aunque la víctima real del acto sea otra.

Nuestra jurisprudencia no ha discutido el error sobre la persona en más de cincuenta años y aun en aquella ocasión no fue necesario discutirlo a fondo. Es a 1939 que tenemos que recurrir para encontrar cómo este Tribunal, empleando figuras del *common law*, atendió una controversia similar a la de autos.

En Pueblo v. Cartagena,[36] el acusado disparó contra una persona pero hirió a una tercera. Al concluir que no era admisible evidencia tendente a demostrar que la muerte del tercero fue incidental mientras el acusado, de "manera ilegal y con malicia premeditada", acometía contra el blanco original con el firme y deliberado propósito de privarle la vida, expresamos que "todas las autoridades están de acuerdo en que si una persona con la intención de matar a otra le ataca e incidentalmente mata a un tercero contra quien no tenía intención alguna de hacerle daño, es culpable de lo mismo que si el interfecto hubiera sido la persona contra quien fue dirigida la agresión".[37] Esto es cónsono con el artículo 17 del Código Penal de 1974. Es

---

[36] 54 D.P.R. 870 (1939).

[37] *Id.*, p. 874. Véase además Pueblo v. Colón, 65 D.P.R. 760, 766 (1946). A semejante conclusión llegamos en Pueblo v. Rivera, 36 D.P.R. 194 (1926) y Caballero v. El Pueblo, 36 D.P.R. 67 (1926), al afirmar que la circunstancia de que el acusado no intentara matar a la víctima sino a un tercero en nada influía la calificación del delito.

decir, una vez establecida la intención del sujeto activo, y en el caso del asesinato en primer grado la deliberación o intención específica de matar, el que la víctima no haya sido la persona a quien se dirigía la acción, ya sea por error en la identificación o porque el golpe se lanzó accidentadamente, no evita que el delito cometido contra el tercero sea el mismo que el que se intentó cometer contra el blanco original de la conducta criminal.

Aunque no tuvimos, durante la vigencia del Código Penal de 1974, la oportunidad de interpretar el artículo 17 aplicable a los eventos objeto de controversia y su interacción con el delito de asesinato en primer grado en su modalidad de deliberación, éste fue objeto de discusión por los tratadistas en Puerto Rico y fue atendido expresamente en las reformas que culminaron en el Código Penal de 2004. Producto de ese proceso, el Código Penal de 2004 suprimió el artículo 17 y consolidó las defensas de error como excluyente de responsabilidad penal en un solo artículo.

Durante la consideración del proyecto que pasó a ser el Código Penal de 2004, se hizo referencia a la anomalía de tener un artículo que declaraba expresamente que la defensa de error no estaba disponible, mientras que en otra parte del Código se discutían los tipos de error excluyentes de responsabilidad penal.[38] De esa forma, la normativa del

---

[38] *Véanse* las expresiones vertidas en el Informe de la Comisión de lo Jurídico del Senado de Puerto Rico, p. 27: "Como indicó el Comité de la Academia en su informe, no es

Código Penal de 2004 responde a las deficiencias percibidas en el suprimido artículo 17 y nos ayuda a interpretar con mayor precisión el alcance de éste, así como las implicaciones del artículo 17 y su interacción con la figura del error de hecho, particularmente lo relacionado al error esencial.

El Código Penal vigente establece el error como causa de exclusión de responsabilidad penal en el artículo 30:

> No incurre en responsabilidad la persona cuyo hecho responde a un error <u>esencial que excluye la intención y la negligencia</u>.
> Si el error se debe a imprudencia, se responderá por negligencia si ésta se sanciona expresamente por la ley.
> Si el error recae sobre una <u>circunstancia agravante o que dé lugar a una modalidad más grave del delito</u>, impedirá la imposición de la pena más grave.[39]

En el caso ante nuestra consideración, la víctima del asesinato no fue el blanco del disparo hecho por el acusado. Para calificar ese error debemos analizar lo que se denomina por la doctrina como el error *in objecto* o *in persona*, así como el error *aberratio ictus* o en el golpe, ambos discutidos dentro del concepto general de error de hecho.[40]

---

necesario, ni usual en el Derecho comparado declarar expresamente la irrelevancia del *error in persona*. La misma se deduce del carácter no esencial de la identidad de la persona en los delitos correspondientes".

[39] <u>33 L.P.R.A. § 4658</u> (Énfasis suplido).

[40] Eugenio Cuello Calón, <u>Derecho Penal</u>, Tomo I, 9na. Ed. (1971), p. 385.

El error *in objecto,* también conocido como *in persona*, recae sobre el objeto de la acción.[41] Como nos explica Díaz Palos, "[s]e dice que hay error *in objecto* cuando el sujeto dirige su acto, por confusión, contra objeto distinto del que estaba en su mente, pero siendo equivalente el objeto atacado y el representado".[42] Nos dice el tratadista que la manifestación principal de este caso es cuando "A mata a B tomándolo equivocadamente por C.[43] Es decir, bajo esta modalidad de error de hecho, el sujeto activo confunde al sujeto pasivo: mata a A pensando que era B.

Por otra parte, el error *aberratio ictus*, también conocido como error en el golpe, es un "supuesto de ejecución defectuosa por accidente extraño al sujeto".[44] Se trata de un "desarrollo fallido de un hecho doloso".[45] Es decir, el sujeto dirige realmente la acción contra el objeto o persona que estaba en su mente, pero el efecto se produce en otro distinto. El ejemplo ofrecido por el

---

[41] F. Muñoz Conde y M. García Arán, Derecho Penal, Parte General, 6ta ed., Valencia, 2004, p. 276.

[42] F. Díaz Palos, Dolo Penal, Barcelona, pp. 45-46 (Énfasis suplido).

[43] *Id.*, p. 46.

[44] *Id.*, p. 47 (Énfasis suplido).

[45] C. Blanco Lozano, Tratado de Derecho Penal Español, Tomo I: El Sistema de la Parte General, Vol. 2: La Estructura del Delito, 2005, p. 379. Nos dice Blanco Lozano que este error es uno en el cual el objeto atacado es similar al que se pretendía atacar.

tratadista Díaz Palos es ilustrador: "A apunta contra B, pero su pulso vacila y alcanza a C".[46]

En el caso de autos, estamos ante un error en el golpe, figura que ha generado mucho debate y división entre los tratadistas.[47] La mayoría propone que el error en el golpe, al igual que en la persona, no varía en lo absoluto la responsabilidad penal del sujeto activo. La propuesta de que el error en el golpe no exime de la responsabilidad penal y que, como ocurre en países de *common law*, el dolo dirigido a la víctima pensada se transfiere a la víctima real, se basa en que el bien jurídico protegido por el delito de asesinato es la <u>vida humana</u> en sí y no la vida de un ser humano <u>en particular</u>.[48]

El concepto de bien jurídico proviene del hecho de que a la norma penal, igual que a las demás normas jurídicas, le incumbe una función eminentemente protectora.[49] Consecuentemente, se tutelan aquellos objetos dignos de protección por el derecho tras la correspondiente

---

[46] *Id.* Véase además Muñoz Conde y García Arán, *Op.Cit.*, p. 276.

[47] Véase Cuello Calón, *Op.Cit.*, p. 386 y Díaz Palos, *Op.Cit.*, pp. 47-48. Nos explican estos tratadistas que la falta de consenso en la doctrina se basa en si la consecuencia del error *aberratio ictus* es que se está ante dos delitos (tentativa de asesinato contra la víctima pretendida y homicidio negligente contra la víctima real) o un solo injusto penal (asesinato contra la víctima real).

[48] Por no ser pertinente a los hechos de este caso, no entraremos en la discusión de la tercera modalidad del asesinato en primer grado recogido en el artículo 106(c) que ocurre cuando el sujeto pasivo ocupa determinado puesto público.

[49] Muñoz Conde y García Arán, *Op.Cit.*, p. 59.

valoración social.[50] En cuanto al delito doloso, éste supone una agresión consciente contra el bien jurídico protegido.[51] Como nos explica el tratadista Blanco Lozano, "[e]l punto de partida político-criminal que rige la inclusión de una determinada conducta en la legislación penal [es] la tutela de un determinado bien jurídico al que se considera merecedor de salvaguarda en el ámbito del Derecho punitivo".[52]

En el delito de asesinato, el bien jurídico protegido es la vida humana, mas no la vida de una persona determinada.[53] Por tanto, en el caso de un asesinato producto de un error, en la persona o en el golpe, donde estaba presente el dolo directo de primer grado al haber deliberación o premeditación, no hace diferencia qué ser humano finalmente sea privado de la vida, ya sea porque el sujeto activo disparó pensando que su blanco era otra persona o, como en este caso, que el golpe no alcanzó a la víctima pretendida porque un tercero se interpuso. En ambos casos la intención de matar a un ser humano estaba presente.

La mayoría de los tratadistas apoyan esta conclusión. Nos dice la profesora Nevares-Muñiz que el error sobre la

---

[50] *Id.*

[51] *Id.*, p. 266.

[52] Blanco Lozano, *Op.Cit.*, p. 68.

[53] *Véase* Cuello Calón, *Op.Cit.*, p. 385; Muñoz Conde y García Arán, *Op.Cit.*, p. 59; Dora Nevares-Muñiz, <u>Nuevo Código Penal de Puerto Rico</u>, 2005, p. 136.

persona o el error en el golpe "no [son] error[es] que recaiga[n] sobre alguno de los elementos esenciales del delito", como exige el artículo 30 del Código Penal vigente.[54] Muñoz Conde señala que "[e]s irrelevante el error en la persona: igualmente será castigado quien creyendo matar a B mata por equivocación a C".[55] Por su parte, para Cuello Calón este tipo de error "no aprovecha al reo, pues se trata de un error accidental [y] no de un error esencial".[56] Dice este tratadista que "[e]n ambas situaciones el mal causado es distinto del propuesto", no obstante su "responsabilidad no sufre alteración".[57] A semejante conclusión llega Díaz Palos, quien parte de la premisa de que se trata de una mera "coincidencia entre [el] resultado producido por el sujeto y la voluntad del

---

[54] Nevares-Muñiz, Derecho Penal, Op.Cit., p. 206. La profesora nos ofrece el siguiente ejemplo: "Así, si A quiere golpear a B, y C recibe el golpe y las lesiones, A no podrá alegar el error de hecho para eximirse de responsabilidad penal. Si intención era golpear a un ser humano, irrespectivamente del ser humano que fuera golpeado". Id., pp. 206-207 (Énfasis suplido). Véase además, Chiesa Aponte, Op.Cit., p. 170.

[55] Muñoz Conde, Op.Cit., p. 14. Este tratadista manifiesta que sí es relevante el error en el golpe, pero ello únicamente en cuanto a la división en la doctrina sobre cuántos delitos podrían darse en dicho caso. Muñoz Conde reconoce que la mayoría de la doctrina trata el error en la persona de manera similar al error en el golpe.

[56] Cuello Calón, Op.Cit., p. 385. El tratadista nos ofrece un ejemplo de esto: "[C]omo cuando en vez de un animal se mata a un hombre […] mientras que lo esencial es la persona humana, el hecho de que esta persona sea Pedro o Juan, es puramente accidental".

[57] Id., p. 386.

mismo; el camino que se utilice es accidental".[58] Nos dice el tratadista que, tanto en el error *in objecto* como en el *aberratio ictus*, no hay diferencia en la responsabilidad penal.[59] Por tanto, "la responsabilidad del autor del hecho no sufre alteración por haber recaído el mal en persona distinta de aquella a quien el procesado tuvo la intención de causarlo".[60]

El tratadista Blanco Lozano también discute cómo atender el delito de asesinato en casos donde se dé un error en la persona y expone que "lo relevante es si el objeto erróneamente atacado [es] semejante al que se pretendía atacar […] porque el tipo penal de asesinato lo único que exige al respecto es matar a otro, y el sujeto activo lo que quería dolosamente era precisamente eso, esto es, matar a otra persona, con independencia de que errase acerca de su identidad".[61] En cuanto al error en el golpe, afirma Blanco Lozano que "la solución más correcta […] no es otra que la de considerar que nos hallamos ante un delito de asesinato consumado" puesto que "lo único que exige el tipo legal" es que se haya matado a otra persona "alevosamente".[62]

---

[58] Días Palos, *Op.Cit.*, p. 44.

[59] *Id.*, p. 87.

[60] *Id.*, p. 90.

[61] Blanco Lozano, *Op.Cit.*, p. 379.

[62] *Id.*, p. 380. Esta doctrina es cónsona con los fallos del Tribunal Supremo de España. En su Sentencia del 5 de diciembre de 1974, Repertorio de Jurisprudencia 5085, Aranzadi, pp. 3883, ese Tribunal se enfrentó a unos hechos

Lo anterior es cónsono con nuestro ordenamiento penal vigente. Los artículos 105 y 106 del Código Penal de 2004 correspondientes al delito de asesinato tienen como objetivo la protección del bien jurídico de la vida.[63] La modalidad del asesinato en primer grado por premeditación recogida en el artículo 106(a), la que, a su vez, requiere que el sujeto activo actúe con dolo directo de primer grado según definido en el artículo 23(a), no se afecta por el hecho de que el autor haya incurrido en error sobre la persona o error en el golpe. Una vez el sujeto activo ha deliberado matar a un ser humano y actúa conforme a esa deliberación, es irrelevante si mata a la persona equivocada o si falla en su golpe y alcanza a un tercero. En todos esos casos, sigue presente el elemento de la deliberación y se ha matado a un ser humano. Eso es todo lo que nuestro ordenamiento requiere para que se entienda

---

donde el sujeto activo actuó con la intención de matar pero alcanzó a un tercero que no era su víctima pretendida. Es decir, se estaba ante un error en el golpe o *aberratio ictus*. Tras analizar la figura del error de hecho y su impacto sobre la formación de la voluntad, el Tribunal Supremo determinó que es insostenible que, "una vez mostrada la voluntad intencionalmente antijurídica[,] no [se acepte] una solución culposa, aunque por error en el golpe, sea otra la persona agredida y lesionada o muerta". *Id.*, p. 3884. Esto puede ocurrir ya sea "por mala dirección de su golpe o por interposición benévola de un tercero". *Id.* (Énfasis suplido). De igual forma, en su Sentencia del 22 de enero de 1979, el Tribunal Supremo de España reiteró que "tanto en el denominado error *in persona* como en la hipótesis de *aberratio ictus*, o error en el golpe, […] a efectos de la culpabilidad dolosa […] es indiferente que sea una u otra la persona muerta o lesionada". Repertorio de Jurisprudencia 128, Aranzadi, pp. 104-105.

[63] 33 L.P.R.A. §§ 4733 y 4734. Igual ocurre con los artículos 82 y 83 del Código Penal de 1974.

cometido el asesinato en primer grado en su modalidad de premeditación o deliberación.

## III.

En el caso de autos, un tribunal de derecho encontró al acusado culpable de asesinato en primer grado en su modalidad de deliberación. En Puerto Rico, la presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito.[64] Por consiguiente, su culpabilidad debe ser probada más allá de duda razonable. Esto es consustancial con el principio de presunción de inocencia y es un elemento del debido proceso de ley.[65] Por tanto, el peso de la prueba permanece, durante todas las etapas del proceso a nivel de instancia, sobre el Estado.[66] Para sostener un veredicto de culpabilidad, la prueba presentada debe ser suficiente en derecho,[67] es decir, se debe probar la culpabilidad del acusado más allá de duda razonable.

Reiteradamente hemos afirmado que esta determinación es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y

---

[64] Pueblo v. Irizarry, 156 D.P.R. 780, 786 (2002). La Regla 110 de Procedimiento Criminal establece este principio con mayor precisión.

[65] Véanse secciones 7 y 11, Artículo II de la Constitución de Puerto Rico; Pueblo v. De León Martínez, 132 D.P.R. 746, 764 (1993).

[66] Pueblo v. Irizarry, supra, p. 787.

[67] Pueblo v. De León Martínez, 132 D.P.R. 746, 764 (1993).

derecho.[68] De igual forma, la determinación que ha hecho el juzgador de los hechos a nivel de instancia a los efectos de que la culpabilidad de la persona imputada ha quedado establecida más allá de duda razonable es revisable en apelación como cuestión de derecho.[69] No obstante, dado que le corresponde al jurado o, en su defecto, al juez dirimir los conflictos de prueba, no intervendremos en tales determinaciones en ausencia de pasión, prejuicio, parcialidad o error manifiesto.[70] Más bien, la determinación de culpabilidad que hace el juzgador de los hechos a nivel de instancia es merecedora de una gran deferencia por parte del tribunal apelativo.[71]

En este caso, tanto los elementos objetivos del delito de asesinato como la intención específica de matar requerida por el artículo 84 del Código Penal de 1974, según definida por el artículo 15(a), están sostenidos por la prueba que obra en el expediente. De éste surge que el acusado y su padre se presentaron a la cancha de baloncesto el día de los hechos armados y con la intención de matar, es decir, tras mediar deliberación. Su intención original era matar al señor Fernando Rodríguez Muñiz. Contra éste disparó el padre del acusado en una ocasión y el propio

---

[68] Pueblo v. Cabán Torres, 117 D.P.R. 645, 653 (1986).

[69] Id.

[70] Pueblo v. Cruz Negrón, 104 D.P.R. 881, 882 (1976). Véase además, Pueblo v. Rodríguez Román, 128 D.P.R. 121 131 (1991); Pueblo v. Cruz Granados, 116 D.P.R. 3, 10 (1984, Opinión del Juez Asociado Negrón García).

[71] Pueblo v. Cabán Torres, supra, pp. 653-654.

acusado en dos ocasiones posteriores. El disparo del padre falló su objetivo. Igual ocurrió con los disparos del acusado dirigidos contra el señor Rodríguez Muñiz. No obstante, uno de estos disparos alcanzó al señor Héctor Luis Mejías Sánchez, quien al ver que el acusado le disparaba a su amigo, lo empujó, lo cual le causó la muerte. Estos hechos están ampliamente sostenidos por la prueba admitida y creída por el juzgador de los hechos, y es suficiente en derecho para un fallo de culpabilidad por asesinato en primer grado. Erró el Tribunal de Apelaciones al modificarlo.[72]

---

[72] El acusado también alegó que el testimonio del principal testigo de cargo, el señor Rodríguez Muñiz, carecía de precisión y contenía lagunas. Por tanto, estima que es insuficiente para determinar su culpa más allá de duda razonable. En cuanto a esto, es norma reiterada que "la evidencia directa de un testigo que merezca entero crédito será prueba suficiente de cualquier hecho […] aun cuando no [fuese] un testimonio perfecto". Pueblo v. Chévere Heredia, 139 D.P.R. 1, 15 (1995). Véase la Regla 110(d) de Evidencia, 32 L.P.R.A. Ap. VI R. 110(d). Por otra parte, las contradicciones en un testimonio sólo ponen en juego su credibilidad, asunto que le toca al juzgador de los hechos resolver. Pueblo v. Torres Rivera, 137 D.P.R. 630, 640 (1994). Pueblo v. Rodríguez Román, *supra*, p. 129 (1991). En Pueblo v. Rodríguez Román manifestamos que "[s]abido es que la máxima *falsus in uno, falsus in ómnibus* no autoriza a rechazar toda la declaración de un testigo porque haya contradicho o faltado a la verdad respecto a uno o más particulares. En otras palabras, es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a la prueba en su totalidad". Pueblo v. Rodríguez Román, *supra*, p. 129, citando a García v. Tribunal Superior, 86 D.P.R. 823 (1962) y Pueblo v. López Rivera, 102 D.P.R. 359, 366 (1974). Además, el hecho de que un testigo incurra en contradicciones en torno a detalles de los hechos no es óbice para que no se le dé crédito a su testimonio, cuando nada increíble o improbable surge de éste. Pueblo v. Chévere Heredia, *supra*, p. 20. Este error tampoco se cometió.

Por las razones previamente expuestas, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala el fallo de culpabilidad emitido por el Tribunal de Primera Instancia por asesinato en primer grado.

Se dictará sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

Antonio Rodríguez Pagán

    Recurrido

*Certiorari*

CC-2009-314

*SENTENCIA*

En San Juan, Puerto Rico, a 17 de junio de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala el fallo de culpabilidad emitido por el Tribunal de Primera Instancia por asesinato en primer grado.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una opinión concurrente a la que se unen el Juez Presidente señor Hernández Denton y los Jueces Asociados señores Martínez Torres y Estrella Martínez.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario

      v.

                                CC-2009-314

Antonio Rodríguez Pagán

    Recurrido



Opinión concurrente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen el Juez Presidente señor Hernández Denton y los Jueces Asociados señor Martínez Torres y señor Estrella Martínez


San Juan, Puerto Rico, a 17 de junio de 2011

La Opinión que hoy emite el Tribunal presenta un análisis cuidadoso y muy bien fundamentado de la figura del error sobre la persona. No obstante, un examen riguroso del expediente demuestra que el referido análisis es ajeno a los hechos del caso de autos y al asunto planteado. La única controversia de la cual verdaderamente venimos llamados a disponer, es si el Ministerio Fiscal probó su acusación de asesinato en primer grado más allá de duda razonable. Por lo anterior, no puedo más que concurrir con el resultado que pronuncia el Tribunal.

I.

La noche del 29 de noviembre de 2004, Fernando Rodríguez Muñiz y Héctor L. Mejías Sánchez estaban jugando baloncesto junto a otras personas en una cancha del barrio Quebrada del Agua en Ponce. En algún momento Fernando se percató de que Antonio Rodríguez González y su hijo, Antonio Rodríguez Pagán ("el recurrido"), se acercaban a la cancha a través de un parque de pelota que colinda con la residencia de éstos. Fernando, al reconocerlos, comenzó a acercárseles siendo seguido por su amigo Héctor, y les dijo: "¡eh!, vamos a hablar por los problemas de ayer". En ese momento el padre del recurrido se volteó y le disparó a Fernando, quien se tumbó al suelo. Acto seguido, Fernando se levantó y continuó acercándose a Antonio Rodríguez González y al recurrido, quienes habían comenzado a retirarse hacia su residencia. Mientras Fernando se dirigía a ellos —aún seguido por su amigo Héctor— dijo: "ah!, si la sacaste y la usaste ahora vas a tener que matarme". Cuando el recurrido y su padre ya estaban accediendo al patio trasero de su hogar, Héctor dijo "¡Nandito, cuidao, cuidao!" y empujó a Fernando justo cuando el recurrido realizó otro disparo.[73] Este segundo proyectil

---

[73] Aunque el testimonio inicial de Fernando Rodríguez Muñiz parece hacer alusión a tres detonaciones, una lectura detenida de la totalidad de su testimonio, así como de la de los demás testigos, evidencia que sólo hubo dos disparos. El primero hecho por Antonio Rodríguez González, del cual se recuperó un casquillo calibre 357, y el segundo por Antonio Rodríguez Pagán, del cual se recuperó un casquillo 45 y la bala en el cuerpo del occiso. Transcripción de vista en su fondo, págs. 23, 35, 110-22, 172-75, 201-03. Así también lo concluyó la fiscal en su informe final: "Surgió del testimonio de nuestro testigo principal que primero el padre

alcanzó a Héctor, quien falleció días más tarde. Una vez los agentes de la Policía se personaron a la residencia de Antonio Rodríguez González y el recurrido, éstos confesaron haber realizado los disparos y cada uno entregó un arma de fuego.

Por los hechos anteriores, se acusó de asesinato en primer grado en concierto y común acuerdo, y violación al artículo 5.15 de la Ley de Armas, al recurrido y su padre. Tras celebrarse el juicio por un tribunal de derecho, en el cual testificaron siete testigos por parte del Estado y uno por parte de la defensa, el juzgador encontró culpable al recurrido pero absolvió al padre, Antonio Rodríguez González. Dictada la sentencia, el recurrido acudió al Tribunal de Apelaciones y solicitó la revocación del dictamen en su contra alegando la comisión de tres errores: no haberse probado su culpabilidad más allá de duda razonable; haber insuficiencia de prueba; y la admisión de cierta evidencia ante las objeciones de la defensa. Por su parte, el Estado se opuso al recurso y argumentó que los testimonios vertidos durante el juicio establecieron todos los elementos del delito más allá de duda razonable. Asimismo sostuvo que el recurrido admitió los hechos durante la investigación criminal, lo cual constituyó una admisión de parte.

Tras evaluar los argumentos ante sí, el foro apelativo intermedio confirmó la condena por violación a la Ley de

hizo un primer tiro que no le dio a nuestro testigo. Y seguidamente el coacusado [ante nosotros recurrido] fue el que hizo el disparo que le causó la muerte al joven que resultó fallecido aquí." Id., pág. 256.

Armas, pero modificó el dictamen en cuanto al asesinato y condenó al recurrido por asesinato en segundo grado. El Tribunal de Apelaciones estimó que se probó más allá de duda razonable el delito de asesinato, mas no su modalidad de primer grado. Dicho foro expresó:

> [N]o estamos en un caso en el que se proyecte el grado de maldad e intención deliberada que requiere la ley y la jurisprudencia para [la] configuración de un asesinato en primer grado.
>
> . . . . . . . . . . . .
>
> . . . En otras palabras, el asesinato perpetrado por el apelante, en el marco del escenario descrito por el único testigo ocular de los hechos suscita serias dudas e inquietudes respecto al grado en que pudieron realmente manifestarse esos elementos, característicos de un asesinato en primer grado. La prueba del Ministerio Público fue difusa a esos efectos. Ciertamente no probó que el apelante, fría y calculadamente, disparara alevosamente en ánimo de ultimar a balazos a la víctima.

Sentencia del Tribunal de Apelaciones, KLAN20070848, págs. 18-19.

Inconforme, la Procuradora General presentó ante nosotros un recurso de *certiorari* acompañado de una moción en auxilio de jurisdicción. Evaluados sus argumentos, expedimos el recurso. En su alegato, el Estado discute como único error la intervención realizada por el foro recurrido al reducir la condena de asesinato a segundo grado, a pesar de haberse probado el elemento de deliberación necesario para establecer el asesinato en primer grado. Arguye que de toda la evidencia que desfiló en el juicio, es posible inferir que el recurrido se personó armado al lugar de los hechos decidido a matar, y durante el encuentro con el occiso y su amigo, reflexionó y actuó afirmativamente para quitarle la vida a un ser humano. De otro lado, el recurrido en su

alegato de oposición nuevamente afirma que este caso se limita a determinar si el Estado satisfizo su deber de probar más allá de duda razonable su culpabilidad. Alega el recurrido que en ello falló el Ministerio Público.

II.

A.

El relato hasta aquí expuesto es un resumen fiel de los acaecimientos hasta que el recurso de autos se perfeccionó ante nosotros. Así, el expediente muestra que la controversia objeto de discusión ante los foros recurridos —y la cual fue traída ante nuestra consideración— se circunscribe a auscultar si el Estado cumplió con su *carga probatoria* respecto al elemento de la deliberación, de manera que proceda una condena por asesinato en primer grado. Las partes **nunca** hicieron alusión alguna a la figura del error sobre la persona ante el Tribunal de Primera Instancia, ni ante el Tribunal de Apelaciones. Dichos foros **tampoco planteron** que el presente caso involucrara la referida doctrina. Asimismo, **en ninguno de los documentos** que fueron presentados ante este Foro es posible encontrar referencia alguna a la equivocación respecto a la víctima del asesinato como posible eximente de responsabilidad criminal. **La razón de todo ello es simple: este caso versa sobre la posible duda razonable, no del posible error sobre la persona.**

Como vimos, el Tribunal de Apelaciones modificó la sentencia del Tribunal de Primera Instancia y redujo la condena de asesinato en primer grado a segundo grado porque

no quedó convencido de que se hubiera probado la deliberación requerida. Su razonamiento no tuvo nada que ver con la posibilidad de que se hubiera asesinado al individuo equivocado. Incluso, de haber sido tal su fundamento, probablemente hubiera descartado la condena bajo la modalidad de segundo grado también, pues hubiera concluido que ni la deliberación, ni la malicia premeditada, se pueden transferir de víctima. Pero nada de ello ocurrió, sólo se modificó el dictamen por albergar duda razonable respecto a la deliberación del asesinato.

¿De dónde, entonces, nos surge la oportunidad de examinar la figura del error sobre la persona? Ciertamente, no proviene del recurso ante nuestra consideración. Es el propio Tribunal quien se formula la innecesaria interrogante. Sólo el Tribunal, y el Tribunal solo, se embarca en una disquisición —sumamente interesante y bien razonada— respecto al error sobre la persona que, cuando menos, se revela inoportuna. De otra parte, me inquieta la manera en que se presentan los hechos en la Opinión del Tribunal. Veamos.

B.

Inicialmente, el Tribunal anuncia que la controversia se enmarca en actos en los que "la víctima interviene en el ataque y recibe el golpe mortal *dirigido a otra persona*". Op. del Tribunal, pág. 1. (Énfasis suplido.) Más adelante afirma que el recurrido disparó "contra [Fernando] Rodríguez", pero que el disparo alcanzó a Héctor L. Mejías. Id., pág. 3. Luego expresa que "la víctima del asesinato *no fue el blanco del disparo* hecho por el acusado" y que "el

golpe no alcanzó a la víctima *pretendida*". Id., págs. 24, 27. (Énfasis suplidos.) Finalmente, la Opinión concluye que la "intención original [de los acusados] era matar al señor Fernando Rodríguez Muñiz" y que el disparo del recurrido "dirigido[] contra" Fernando falló su objetivo porque alcanzó a Héctor. Id., pág. 33.

Tras examinar cuidadosamente el testimonio vertido durante el juicio por el único testigo de los hechos, Fernando Rodríguez Muñiz, nos percatamos que ninguna de las aseveraciones fácticas antes citadas tienen origen en la prueba presentada ante el foro primario. Fernando testificó que cuando Antonio Rodríguez González "disparó, al par de segundos se escuchó el otro tiro, que ahí fue que cogió a Héctor Luis". Transcripción de vista en su fondo, pág. 202. En cuanto a Héctor, Fernando testificó: "venía hacia donde mí y me echó hacia un lado y ahí fue que cogió el tiro". Id., pág. 204. Respecto a ese último disparo, Fernando sólo expresó: "Ahí es que viene la segunda detonación, ahí fue que le dieron a él, a Héctor Luis Mejías. Más na'." Id., pág. 215. No hayamos ninguna expresión en el expediente sobre quién era la víctima pretendida, el blanco del disparo o contra cuál persona se dirigió el proyectil del recurrido. Por ello, no podemos afirmar que el recurrido intentó quitarle la vida a una persona, mas por razones ajenas a su voluntad, sus acciones causaron la muerte de otra. No podemos concluir que el recurrido falló su objetivo.

Mas bien, la evidencia nos muestra que el recurrido acompañó a su padre Antonio Rodríguez González —ambos

armados– hasta la cancha en la cual se encontraban Fernando Rodríguez Muñiz y Héctor L. Mejías Sánchez. Luego de que Fernando y Héctor se dirigieran hacia el recurrido y su padre, y Fernando los invitara a hablar sobre hechos del día anterior, Antonio Rodríguez González le disparó a Fernando. Poco después, cuando Fernando y Héctor continuaron acercándoseles, el recurrido realizó un segundo disparo que alcanzó a Héctor mientras éste empujaba a Fernando. Posteriormente, Héctor falleció.

La relación de hechos, sin dudas, evidencia la malicia premeditada y la deliberación con la que actuó el recurrido. Se personó al lugar armado y una vez se enfrentó al occiso y su amigo, no dudó en asistir a su padre abriendo fuego contra aquéllos. De manera que erró el Tribunal de Apelaciones al modificar la sentencia del Tribunal de Primera Instancia para reducir la condena del recurrido a asesinato en segundo grado. Consecuentemente, estimo correcto el dictamen que ordena hoy el Tribunal al revocar al foro recurrido.

Empero, por las razones ya señaladas, considero que el Tribunal debió limitarse a analizar si existía duda razonable sobre el asesinato en primer grado y evitar enunciar doctrinas innecesarias y responder interrogantes jurídicas que no le fueron propiamente planteadas. *Véanse*, *Misión Industrial de Puerto Rico v. Junta de Planificación*, 146 D.P.R. 64, 145 (1998); *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340, 351 (1990); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965); *Garaje Rubén, Inc. v. Tribunal Superior*, 101 D.P.R. 236, 242 (1973); *Autoridad sobre Hogares*

*v. Sagastivelza*, 71 D.P.R. 436, 439 (1950); *Banco Territorial y Agrícola v. Vidal*, 42 D.P.R. 869, 872 (1931).  Hacerlo milita en contra de la justiciabilidad del pleito, pues se prescinde de litigantes que promuevan sus posturas vigorosamente ante el foro judicial.  *Véase*, *Noriega v. Hernández Colón*, 135 D.P.R. 406, 427 (1994).

En suma, el estudio confeccionado por el Tribunal respecto a la figura del error sobre la persona como posible eximente de responsabilidad criminal, no era necesario para su fallo.  *Véanse*, *Ortiz v. Panel F.E.I.*, 155 D.P.R. 219, 253 (2001); *Martínez v. Registrador*, 54 D.P.R. 7 (1938); *Ponce & Guayama Railroad Co. v. Antonetti*, 17 D.P.R. 352 (1911).  Por todo lo anterior, concurro con el resultado.


                                        Anabelle Rodríguez Rodríguez
                                              Juez Asociada