Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>JAVIER E. CALCAÑO BRIGNONI<br><br>Apelante | KLAN202100182 | ***Apelación***<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Sobre: Art. 93 CP Asesinato en Primer Grado y otros<br><br>Caso Núm.: NSCR2017-00172 (402) |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Romero García y el Juez Sánchez Ramos.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de febrero de 2024.

Comparece mediante el recurso de apelación el *Sr. Javier E. Calcaño Brignoni* (en adelante, "señor Calcaño Brignoni o apelante"), para que revoquemos la *Sentencia* dictada el 3 de febrero de 2021 por el Tribunal de Primera Instancia, Sala Superior de Fajardo (en adelante, "TPI"). Allí, el señor Calcaño Brignoni fue sentenciado a una pena de cárcel que totalizó ciento veintinueve (129) años.[1] Aunque el apelante solicitó reconsideración, el TPI mantuvo la sentencia impuesta.[2]

---

[1] El señor Calcaño Brignoni fue sentenciado por los siguientes delitos:
- Artículo 93 (b) de la Ley Núm. 146 – 2012, según enmendada conocida como *"Código Penal de Puerto Rico" de 2012*. (Asesinato en primer grado). 33 LPRA sec. 5142.
- Artículo 190 (d) de la Ley Núm. 146 – 2012, según enmendada conocida como *"Código Penal de Puerto Rico" de 2012*. (Robo agravado). 33 LPRA sec. 5260.
- Artículo 5.04 de la Ley Núm. 404-2000, según enmendada conocida como la *Ley de Armas de Puerto Rico*. (Portación ilegal). 25 LPRA ant. sec. 458c.
- Artículo 5.15 de la Ley Núm. 404-2000, según enmendada conocida como la *Ley de Armas de Puerto Rico*. (Apuntar y disparar ilegalmente). 25 LPRA ant. sec. 458n.
- Artículo 7.03 de la Ley Núm. 404-2000, según enmendada conocida como la *Ley de Armas de Puerto Rico*. (Pena agravada). 25 LPRA ant. sec. 406b.

[2] Notificada el 23 de febrero de 2021.

Número Identificador

SEN2024_____

Luego de varios trámites, el recurso de epígrafe quedó perfeccionado, por lo que procedemos a **confirmar** la *Sentencia* apelada. **Veamos.**

**-I-**

El **6 de enero de 2016**, en horas de la noche, el Sr. Edgardo Rivera Osorio (en adelante, "señor Rivera Osorio") fue asesinado mientras se encontraba en su residencia en el pueblo de Río Grande.

De la investigación realizada sobre estos hechos, el **1 de agosto de 2016** fue detenido en su residencia de Río Grande el señor Calcaño Brignoni, alrededor de las 12:00 p.m. Los agentes del Cuerpo de Investigaciones Criminales de Fajardo (en adelante, "CIC") lo transportaron hasta el Cuartel General de la Policía de Puerto Rico en Hato Rey (en adelante, "Cuartel General").

En el Cuartel General a las a las 2:30 p.m., de ese mismo día, el Agte. José R. Lebrón Alicea del CIC (en adelante, "Agte. Lebrón Alicea") le hizo las advertencias de ley al señor Calcaño Brignoni, antes de iniciar el interrogatorio. Ese hecho quedó perpetuado cuando el apelante inició y firmó un documento intitulado *"FORMULARIO DE ADVERTENCIAS PARA PERSONAS SOSPECHOSAS EN CUSTODIA ANTES DE HACER O REINICIAR UN INTERROGATORIO"*.[3] Así, admitió su participación en el robo y asesinato del señor Rivera Osorio.

Al día siguiente, **2 de agosto de 2016**, a las a las 12:50 a.m., hizo una confesión escrita y jurada en presencia de la fiscal a cargo del caso, Marieli Rosario Figueroa (en adelante, "fiscal Rosario Figueroa").[4] El apelante confesó lo siguiente:

> Yo, <u>JAVIER E. CALCAÑO BRIGNONI</u> vecino de RÍO GRANDE, Puerto Rico, 25 años de edad. Ante el Fiscal comparezco y, previa las advertencias de ley que me han sido hechas, espontáneamente bajo juramento declaro:

---

[3] *Véase*, Apéndice I del *Alegato del Apelante*, pág. 1.
[4] La *Hon. Marieli Rosario Figueroa* fue la fiscal a cargo durante la investigación del caso, sin embargo, durante el proceso de juicio la Fiscal fue nombrada Jueza Municipal.

*Fiscal*: Buenas noches, yo soy la Fiscal Marieli Rosario Figueroa. Estoy investigando unos hechos delictivos, ocurridos el 6 de enero de 2016. A raíz de dicha investigación, yo me veo en la obligación de hacerle unas advertencias; es decir, de informarle a usted de unos derechos que le cobijan, por ser sospechoso de los delitos de asesinato y ley de armas. Las advertencias son las siguientes:

1. Usted tiene el derecho a permanecer callado y a no declarar.

2. Cualquier cosa que usted diga puede ser usada en su contra.

3. Usted tiene el derecho a hablar con un abogado para que le aconseje antes de yo hacerle cualquier pregunta y, además, dicho abogado puede acompañarlo durante el interrogatorio.

4. Si usted no puede pagar un abogado, le conseguiré uno antes de interrogarlo, libre de costo alguno, si así usted lo desea.

5. Si usted se decide a contestar mis preguntas sin estar asistido de un abogado, puede negarse a contestar cualquier pregunta y en cualquier momento puede dejar de contestar y solicitar asistencia legal.

6. Su declaración tiene que ser libre, voluntaria y espontánea y no se puede ejercer sobre usted ninguna presión, ni amenaza, ni coacción o intimidación para obligarle a declarar.

**Fiscal: ¿Usted ha entendido todo lo que le he explicado?**

**Testigo: <u>Sí.</u>**

*Fiscal*: ¿Aún así y conociendo sus derechos, desea declarar; a pesar de lo que le he explicado?

*Testigo*: Sí.

*Fiscal*: ¿Tiene alguna duda?

*Testigo*: No.

*Fiscal*: ¿Cómo se siente usted físicamente?

*Testigo*: Físicamente estoy bien. Estoy en mis cinco sentidos. Estoy un poco nervioso.

*Fiscal*: ¿Cómo se encuentra mentalmente?

*Testigo*: Bien.

*Fiscal*: ¿Ahora mismo está bajo los efectos de alguna sustancia controlada?

*Testigo*: No.

*Fiscal*: ¿Ha tomado alguna bebida alcohólica?

*Testigo*: No.

*Fiscal*: ¿Toma algún medicamento?

*Testigo*: No.

*Fiscal*: ¿Hasta qué grado llegó en la escuela?

*Testigo*: Cuarto año.

*Fiscal*: ¿Sabe leer y escribir?

*Testigo*: Sí.

*Fiscal*: ¿Cuál es su idioma principal?

*Testigo*: Español

*Fiscal*: ¿Desde los hechos hasta el día de hoy, ha estado en libertad o custodiado por policías?

*Testigo*: En libertad; trabajando con la compañía K.C.S (Kitchen Cleaning and Staffing), que somos sub - contratados por varios hoteles.

**Fiscal: ¿Comió en el día de hoy?**

*Testigo*: Sí. Me comí un sándwich de churrasco, una 7up y una pizza de pepperoni, pero le saqué el pepperoni porque me da acidez.

*Fiscal*: En el día de hoy, como le trataron los policías**,** ¿cómo ha sido tratado por los policías que forman parte de la investigación de este caso?

*Testigo*: Me trataron bien; buen trato.

*Fiscal*: En el día de hoy, ¿cómo ha sido tratado por esta fiscal, es decir, por mí?

Testigo: Bien.

*Fiscal: ¿Está consciente de que la información que usted me está dando es una que brinda sin que la fiscal le esté ofreciendo algo a cambio?*
*Testigo: Eso es así.*
*Fiscal: ¿Se le ha ofrecido algo por parte de la Policía de Puerto Rico para que usted declare?*
*Testigo: No.*
*Fiscal: ¿Se le ha ofrecido a usted algo a cambio para que usted declare?*
*Testigo: No*
*Fiscal: ¿Sabe qué día es hoy?*
*Testigo: 2 de agosto de 2016.*
*Fiscal: ¿Sabe por qué está aquí?*
*Testigo: Si. Estoy aquí por una investigación de asesinato, robo, ley de armas y otros.*
*Fiscal: Las advertencias que yo le hice hoy, ¿se las hizo la Policía de Puerto Rico?*
*Testigo: Sí.*
*Fiscal: ¿Quién?*
*Testigo: Agte. Lebrón.*
*Fiscal: ¿Sabe que es sospechoso de los delitos de asesinato y ley de armas?*
*Testigo: Sí.*
*Fiscal: Ha entendido las advertencias que le he explicado y las has entendido? ¿aún así deseas declarar?*
*Testigo: Sí.*
*Fiscal: ¿Qué, si algo ocurrió con relación a estos hechos del 06 de enero de 2016?*
*Testigo: Yo conozco a Peter Giovanni, a Kevin Nieves y a Abdiel desde chamaquitos porque estudiamos juntos en la misma escuela. Peter Giovanni es pequeño (bajito), con la piel color café, se recorta bajito, flaquito. El apodo de Kevin es "Gusano". Este es chiquitito, blanquito, a chinaíto, tiene pantallas, no tiene tatuajes, siempre está bien vestido y siempre usa un bultito para el lao'. Este camina con "flow" o piquete. Abdiel es flaquito, como de mi estatura, un poco menos que yo, tiene tatuaje en uno de los brazos y en una de las piernas (en la batata), siempre está bien vestido con pantalones "Jordan".*

*El 05 de enero de 2016, yo estaba en mi casa y Peter Giovanni me llamó a mi celular, a través de la aplicación de "Messenger" de "Facebook". Esto fue como a las 5:00 de la tarde más o menos. Mi perfil en "Facebook" siempre ha sido Javier Elías y el de Peter es Peter Giovanni. Mi celular es el 407-342-4071. Peter Giovainni me dijo que fuéramos para su casa, que queda en Río Grande Estate. Todos somos de allí, de Río Grande Estate (Peter Giovanni, yo, Abdiel). Peter me dijo que fuera a su casa para hacer un "caballo" que es que él pone la mitad, yo pongo la mitad y fumamos los dos (marihuana). Fui a pie a la casa de Peter Giovanni y éste me dijo que le diera mi teléfono para llamar a Abdiel. Le dije que lo que yo tenía era el "Messenger" de Abdiel, que yo no tenía su número de teléfono, que lo llamara por ahí (Messenger). Le di mi teléfono a Peter y escucho cuando Peter le dijo a Abdiel que tenía que hablar con él, que llegara hasta la casa. Media hora después más o menos, Abdiel llegó a la casa de Peter Giovanni en una Pathfinder color oro. Esa guagua es de Abdiel.*

*Cuando Abdiel llegó a la casa de Peter Giovanni, se bajó de la guagua y entró a la marquesina de la casa de Peter. Los dos se saludaron, se dan la mano y, mientras fumábamos con la puerta de garaje cerrada a mitad, escucho cuando Peter le dijo a Abdiel: "Hay un palo de chavos. Necesito un vehículo para hacer eso". Abdiel le dijo a Peter Giovanni: "¿De verdad que hay un palo de chavos?" y Peter le dijo que sí, que había un palo de cadenas, sortijas, pulseras y que necesitaba un*

*vehículo para hacer eso. Escucho cuando Abdiel le dijo a Peter Giovanni que él tenía la persona que le conseguía el vehículo para hacer el robo. Abdiel llamó a alguien desde su celular y escucho cuando éste dijo: "Mira, necesito un carro pa' un palito (robo)". Mientras Peter Giovanni y Abdiel hablaban, les pregunté que dónde era ese "palo." y los dos me dijeron que no me iban a decir, que yo no era de fiar, que ellos no confiaban en mí. Terminé de fumar y me fui para mi casa; Peter Giovanni y Abdiel se quedaron en la marquesina de la casa de Peter Giovanni.*

*El 06 de enero de 2016, a eso de las 3:00 de la tarde más o menos, estaba en la urbanización (Río Grande Estate) y vi la guagua Pathfinder de Abdiel dando rondas dentro de la urbanización. No vi quién estaba dentro de la guagua porque tiene tintes bien oscuros y no se ve pa' dentro. A eso de las 5:30 a 6:00 de la tarde más o menos, caminando por la Avenida B de la urbanización y vi a "Gusano" y a Abdiel en un Toyota Echo, dos puertas, color dorado. "Gusano" estaba guiando y Abdiel estaba sentado en la parte del frente del vehículo. Los dos me invitaron a dar una vuelta y me dijeron que fumáramos un "capsulón". "Capsulón" es encerrarse en un carro con el aire prendido y prender un "phillies" de marihuana. Le dije que estaba bien y Abdiel se bajó del carro y se montó en el asiento de atrás del carro Echo y yo me senté en el sillón del frente, el del pasajero. Ese día yo tenía un mahón largo y una camisa oscura, "Gusano" tenía un mahón azul largo y una camisa de color oscuro y Abdiel tenía un pantalón largo de color oscuro y una t-shirt negra y una gorra de los "Yankees". Cuando me monté en el carro, "Gusano" arrancó y empezamos a dar vueltas por la urbanización. Estuvimos fumando "pasto" (marihuana) y seguimos dando vueltas. Cuando ya era obscuro, Peter llamó a mi aplicación de "Messenger" de "Facebook". Contesté el teléfono y Peter me dijo que le pasara a Abdiel. Cuando le pasé el teléfono escucho que Abdiel dijo: "Está bien. Te llamo horita. Estamos por aquí, dando vueltas en la urbanización". Mientras estuvimos dando vueltas dentro de la urbanización, Abdiel era quien le daba las instrucciones a "Gusano" de donde ir y en qué lugar virar. En un momento dado, estando dentro de la urbanización, escucho cuando "Gusano" le dijo a Abdiel: "¿A quién es la persona que le vamos a robar?" y Abdiel señaló la casa de la persona que le iban a robar, que era la casa del bombero, que es vecino Peter Giovanni. La casa del bombero queda frente, al cruzar la calle de la casa de Peter Giovanni. Al bombero lo conocía porque compartíamos en la tienda que está dentro de la urbanización. Este era alto, fortachón", trigueño. Era humilde y nunca tuvo problemas con nadie. Pude ver que el bombero estaba limpiando la motora dentro de la marquesina de la casa porque la puerta de garaje estaba abierta. Después que Abdel señaló la casa del bombero, "Gusano" siguió guiando por la misma calle del bombero hasta llegar al final. Peter Giovanni volvió a llamar a mi celular por la aplicación de "Messenger" y cuando contesté me dijo que le pasara el teléfono a Abdiel. Cuando Abdiel enganchó la llamada, escucho cuando le dijo a "Gusano": "Vira aquí y bajamos antes de la calle donde vive el bombero" Viramos en U, bajamos hasta el final dela calle que está antes de la calle donde vive el bombero y Abdiel le dijo a "Gusano": "Parquéate en reversa. Quédate ahí y no te muevas de ahí". "Gusano" parqueó el carro en reversa en la calle del bombero, que es la misma calle donde vive Peter Giovanni. "Gusano" estacionó el carro como de cuatro (4) a seis (6) casas de donde quedaba la del bombero. La tablilla del carro quedaba en dirección a la casa de Peter Giovanni y la del bombero. Después de eso Abdiel me dijo que me bajara del carro y que lo acompañara. Procedí a bajarme del carro, eché mi asiento hacia el frente y Abdiel se*

*bajó del vehículo, agarrándose el lado derecho de la cintura. Abdiel empezó a caminar primero y yo iba detrás de él; iba un poco retirado de él. Los dos caminamos en dirección a la casa del bombero. Cuando nos estamos acercando a la casa del bombero, veo que Abdiel se "espeta" la gorra para taparse la cara y yo me tapé la cara con mi propia camisa, dejando por fuera mis ojos solamente. Veo que cuando Abdiel está llegando frente a la casa del bombero, sacó una pistola del lado derecho de su cintura, anunció el asalto, le apuntó con la pistola y dijo: "Esto es un asalto. Yo quiero chavos o prendas. No quiero hacerte daño". La pistola es Glock color negra. El bombero estaba sentado frente a una motora en la que él estaba bregando. Abdiel se quedó "custodiando" (apuntándole con la pistola) al bombero, a la vez que apretaba el botón de cerrar la puerta de garaje. La puerta de garaje se cerró completa y los tres (el bombero, Abdiel y yo) quedamos dentro de la casa, en la marquesina. Escucho cuando el bombero le dijo a Abdiel que no tenía dinero, que rebuscara y lo que encontrara de valor que se lo llevara. Abdiel me dio indicaciones de que procediera a buscar para ver si encontraba algo y entré a la casa del bombero, empujando el "rolling door" que está en la marquesina. Una vez entré a la casa, vi que encima de una mesa de la sala había una "mariconera", la cogí y me la enganché encima; me la puse cruzada en el pecho. Salí a la marquesina y vi que Abdiel todavía estaba apuntando al bombero en dicha área. Le dije a Abdiel que no había nada y Abdiel se molestó y me dijo que no, que yo no sabía buscar bien, que me quedara en la marquesina y velara al bombero, a la vez que se quitaba la camisa polo color blanca que tenía puesta y me la daba a mí. Abdiel se quedó con una camisa oscura que tenía debajo de la polo. Mientras el bombero seguía en el piso, me paré frente a él y me puse a velarlo, mientras que Abdiel entró a la casa; entró con la pistola en una de sus manos. Desde la marquesina, escucho que Abdiel estaba rebuscando en el interior de la casa; escuchaba gavetas cerrando y puertas de los gabinetes cerrando también. Al poco rato, Abdiel salió del interior de la casa y me dijo que nos fuéramos, que nos olvidáramos de eso. Le di la espalda al bombero y cuando Abdiel va a salir por la puerta de sala, el bombero se le tiró encima a Abdiel. Abdiel se dio en la cabeza con la puerta de "screen" que está en la sala de la casa. El bombero y Abdiel empezaron a forcejear en la sala de la casa del bombero y escucho que Abdiel dijo: "Se me cayó la herramienta". Como yo estaba parado frente a la puerta de "rolling door" viendo el forcejeo de Abdiel y del bombero, pude ver que la pistola Glock que Abdiel tenía en sus manos había caído en el piso, donde Abdiel y el bombero estaban forcejando. Recogí la pistola, me la puse en la cintura, apreté él botón para abrir la puerta de la marquesina para huir y cuando logré abrirla, salí de la casa. Estando fuera de la casa del bombero, vi Abdiel y el bombero dejaron de forcejear y ahí el bombero se me tiró encima y empezó a forcejear conmigo. Esto pasó frente a la casa del bombero, en unos escaloncitos que hay en la parte del frente de la casa. Mientras forcejeaba con el bombero, Abdiel se fue corriendo hacia donde estaba el vehículo Echo y ahí se me cayó la pistola al piso. Con mi mano derecha, recogí la pistola del piso para irme de la casa y, para asustar al bombero, sin mirar atrás, eché mi mano derecha hacia atrás e hice una detonación. Cuando miré hacia atrás, vi que el bombero se estaba agarrando el pecho con las dos manos, dijo: "Ay" y después cayó al piso. Me fui corriendo para el vehículo Echo, el cual todavía estaba estacionado en el mismo lugar. Cuando llegué al vehículo, Abdiel estaba semi - sentado en el asiento del frente y, como el espaldar del asiento estaba echado hacia el frente, me monté en el asiento de atrás. A*

> *Abdiel le di la "mariconera" y la pistola y éste me preguntó si lo había herido. Le dije que no sabía, que nos fuéramos. Ahí Abdiel le dijo que nos fuéramos y le dije que me dejara en la Avenida B. De camino a la Avenida B, Abdiel dijo que lo que había dentro de la "mariconera" eran cosas personales e identificaciones; no había celular. Cuando llegamos a la Avenida B, me dejaron allí y Abdiel y "Gusano" se fueron del lugar en el Echo. Yo procedía irme para mi casa. Después de eso, no volví a encontrarme con Abdiel.*
>     ***Estoy declarando libre y voluntariamente. Nadie me ha presionado, nadie me ha puesto palabras en mi boca. Temo por mi seguridad. Quiero que todo esto se esclarezca. No declaré antes porque jamás pensé que me fueran a buscar los agentes a mi casa por esta situación.***
>
> ***Fiscal:*** *Hay algo más que quieras declarar.*
> ***Testigo:*** *No, eso es todo.*[5]

Ante el temor expresado por el señor Calcaño Brignoni, fue llevado al Albergue de Testigos (en adelante, "Albergue"). Ese mismo día, **2 de agosto de 2016**, el Ministerio Público presentó sendas denuncias en ausencia contra el *Sr. Abdiel José Ilarraza Marcano* (en adelante, "Abdiel Ilarraza"), el *Sr. Kevin Antonio Nieves Encarnación c/p Gusano* (en adelante, "Kevin Nieves") y el *Sr. Peter Geovany Burgos Figueroa* (en adelante, "Peter Giovanny") por asesinato en primer grado, robo agravado y ley de armas por la muerte del señor Rivera Osorio. El TPI determinó causa probable para arresto y emitió sendas órdenes de arresto. De igual forma, ordenó a realizar muestras de ADN al apelante y Abdiel Ilarraza. Posteriormente, los tres imputados fueron arrestados.

Cabe destacar que el **3 de agosto de 2016** se emitió un *Informe de Incidencias,* ocurrido en el Albergue, en el cual, se informó que el señor Calcaño Brignoni, en una llamada telefónica a su familia, manifestó haber mentido en la declaración jurada por amenazas de los agentes y la fiscal.[6] No obstante, y en esa **misma fecha**, los agentes suscribieron otro informe en el que el testigo se retractó: *"[n]o me obligaron todo lo que dice la declaración jurada es*

---

[5] Véase, la confesión en el Anejo I del Apéndice del *ALEGATO DEL PUEBLO*, págs. 1 – 8. *Énfasis nuestro.*
[6] Apéndice IV del *Alegato del Apelante*, pág. 8.

*cierto, lo dije porque tengo miedo por mi familia. No quiero que nada malo les pase".*[7]

En la vista preliminar para juicio, el apelante compareció como testigo de cargo y declaró contra los tres (3) imputados, Peter Giovanny, Kevin Nieves y Abdiel Ilarraza, en los casos *NSCR201600786* y *NSCR201600787*. El juez determinó causa para juicio <u>únicamente</u> contra Abdiel Ilarraza y se señaló la fecha de juicio.

No obstante, el **31 de diciembre de 2016** el señor Calcaño Brignoni abandonó el Albergue sin autorización alguna. Razón por la cual, para la **misma fecha**, el Ministerio Público presentó en su contra cinco (5) denuncias en ausencia por asesinato en primer grado, robo agravado y tres cargos por ley de armas. El TPI determinó causa para arresto en su ausencia en todas denuncias, fijó una fianza y ordenó su arresto.[8]

Consecuentemente, el **4 de enero de 2017** el señor Calcaño Brignoni fue arrestado y diferida la fianza bajo las condiciones de grillete electrónico ("lock down") del Programa de Servicio con Antelación al Juicio.[9] El **23 de febrero de 2017** se celebró la vista preliminar para juicio, en la que se determinó causa para juicio en los cinco (5) cargos imputados. Por lo que el **16 de marzo de 2017**, se realizó la lectura de acusación.

Luego de varios trámites y posposiciones, el juicio fue celebrado por tribunal de derecho en los días: 19 de septiembre de 2019; 12 de noviembre de 2019; 9 y 10 de enero de 2020; 26 de junio de 2020; 1, 9 y 10 de julio de 2020; 5, 11, 13 y 17 de agosto de 2020; 22, 23, 24 y 30 de septiembre de 2020; 1 de octubre de 2020; y, 23 de noviembre de 2020.

---

[7] *Id.*, a las págs. 9 – 10.

[8] Apéndice V del *Alegato del Apelante*, págs. 11 – 16.

[9] Véase, Auto de prisión provisional que obra en el Tomo I de los expedientes originales.

El Ministerio Público presentó prueba testimonial, documental e ilustrativa. En específico, se presentaron los siguientes testimonios de cargo:

1. **Agente Carlos D. González Díaz**, policía de Puerto Rico ("Agte. González Díaz").

Perito de *Servicios Técnicos* de la *Policía de Puerto Rico*, y así, fue estipulado por las partes.[10]

Acordonó la escena del crimen y tomó 67 fotografías que fueron estipuladas y marcadas en bloque como Exhibit 1E – 111E.[11] Además, tomó una muestra con un colector bucal al acusado Calcaño Brignoni, y la remitió al *Negociado de Ciencias Forenses* ("Ciencias Forense").[12] También, ocupó en la escena una **camisa tipo polo de color blanca** y una gorra azul *navy* con el logo *NY*, por lo cual, solicitó a Ciencias Forense el análisis de esas piezas; y, pruebas de balísticas de dos proyectiles y su derivados, tres casquillos de bala calibre.40, una bala calibre .40 sin disparar, y un vehículo Toyota, Rav-4.[13]

2. **Sargento Luis D. Osorio Guzmán**, policía de Puerto Rico ("Sgto. Osorio Guzmán").

El Sgto. Osorio Guzmán testificó que mientras realizaba un patrullaje preventivo el día de los hechos, recibió una comunicación a través del sistema 911,[14] por lo que se personó hasta la residencia y observó a una persona tirada en el suelo con una herida en el pecho.[15]

Declaró que, al no llegar la ambulancia al lugar, escoltó a los vecinos de la persona herida hacia el CDT de Río Grande.[16] Al ver la ambulancia se detuvo, y cuando los paramédicos revisaron al herido, ya no tenía signos vitales.[17] Por lo que, instruyó a la Agente Yanira Velázquez Ventura a quedarse en ese lugar, mientras el regresaba a custodiar la escena de la residencia.[18]

3. **Agente Yanira Velázquez Ventura**, policía de Puerto Rico ("Agte. Velázquez Ventura").

Manifestó que no llegó hasta la residencia el día de los hechos,[19] ya que en la entrada de la *Urbanización Río Grandes Estates,* el vehículo que transportaba a la víctima venía de salida hacia Carolina.[20] Relató, que el cuerpo de la víctima se encontraba en el asiento del pasajero.[21]

Además, expresó que realizó el primer informe de la Policía, donde plasmó todo lo ocurrido.[22]

---

[10] *Transcripción* de la Prueba Oral (TPO), Vista del 10 de enero de 2020, a las págs. 54 – 56.

[11] *Id.*, a las págs. 58 – 59.

[12] *Id.*, a las págs. 90 – 91.

[13] *Id.*, a las págs. 92 – 102.

[14] *Id.*, a la pág. 102.

[15] *Id.*, a la pág. 103.

[16] *Id.*

[17] *Id.*, a la pág. 104.

[18] *Id.*

[19] TPO, Vista del 5 de agosto de 2020, a las págs. 152, 155.

[20] *Id.*, a la pág. 152.

[21] *Id.*, a la pág. 153.

[22] *Id.*, a la pág. 157.

**4. Sra. Johanna Lee López Agosto** ("señora López Agosto").

La señora López Agosto era la esposa de la víctima, señor Rivera Osorio.[23] En lo pertinente, declaró que el día de los hechos, su esposo no los acompañó a la Pista de Patinaje en San Juan, ya que entraba a su trabajo a las 11:00 de la noche.[24] Pese a llegar hasta la pista de Patinaje no pudieron entrar.[25]

Testificó que, de regreso a su hogar, una vecina llamó a su hija para informarle sobre el disparo que recibió el señor Rivera Osorio.[26] Esa vecina indicó que llegaran hasta el CDT de Río Grande.[27] Sin embargo, su hija recibió una segunda llamada, en la que le informaron que el señor Rivera Osorio había fallecido.[28]

Referente a la escena en la residencia, expresó que su cuarto estaba desorganizado.[29] Señaló que al observar, notó que faltaban dos (2) sortijas, un reloj *Rado* y la cartera del señor Rivera Osorio.[30]

Además, testificó que el Agte. Lebrón Alicea la citó a ella y a su hija mayor, Grace Lee Rivera López ("Grace Lee o hija mayor") para ser entrevistadas.[31] Manifestó, que pudo observar los videos capturados por las cámaras de seguridad de su vecino, sin embargo, no reconoció a los individuos que entraron a la residencia.[32] Añadió, que contrario a ella, su hija Grace Lee, le mencionó "algo" al Agte. Lebrón Alicea relacionado al video.[33]

**5. Agente Jasmine Justino Falú** ("Agte. Justino Falú").

Declaró que trabaja en el *Centro de Recopilación, Análisis y Diseminación de Inteligencia Criminal* ("CRADIC") de Humacao, división dedicada a la extracción de cámaras de seguridad.[34]

Testificó que acudió a Río Grande para entrevistarse con el Agte. Lebrón Alicea y ocupar unos videos de las cámaras de seguridad del Sr. Manuel Maysonet (vecino del señor Rivera Osorio).[35] Expresó que las cámaras apuntaban hacia las casas del frente,[36] por lo que grabaron una pelea que ocurrió en la residencia del vecino del frente.[37]

Explicó el proceso de recopilación de las imágenes solicitadas por el Agte. Lebrón Alicea, específicamente, las ocurridas el 6 de enero de 2016, entre las 9:00 y 9:50 de la noche.[38]

**6. Agte. José R. Lebrón Alicea** – Agente del CIC a cargo de la investigación del presente caso.

---

[23] *Id.*, a la pág. 163.
[24] *Id.*, a la pág. 164.
[25] *Id.*, a la pág. 166.
[26] *Id.*, a las págs. 166 – 167.
[27] *Id.*, a la pág. 167.
[28] *Id.*
[29] *Id.*, a la pág. 171.
[30] *Id.*, a las págs. 174 – 175.
[31] *Id.*, a la pág. 178.
[32] *Id.*
[33] *Id.*, a la pág. 179. A la señora López Agosto no se le permitió testificar a sobre el contenido de lo que su hija Grace Lee le informó al Agte. Lebrón Alicea, por ser prueba de referencia.
[34] TPO, Vista del 22 de septiembre de 2020, a las págs. 212 – 213.
[35] *Id.*, a la pág. 215.
[36] *Id.*, a la pág. 216.
[37] *Id.*
[38] *Id.*, a las págs. 218 – 222.

Testificó que el 6 de enero de 2016 se personó a la residencia G-10 de la *Urbanización Río Grande Estates*, por órdenes de su supervisor.[39] Especificó, que había ocurrido un asesinato, y detalló que habían dos (2) escenas,[40] por lo cual, aclaró que la "escena uno" era la residencia, mientras que la "escena dos" era donde se encontraba el vehículo con la víctima en el interior.[41] Describió las fotografías y piezas de evidencia recopiladas de ambas escenas.

Relató que nunca recuperó los artículos que la señora López Agosto identificó como desaparecidos, y cuyo valor fue estimado en 1,350.00.[42] Señaló que el 7 de enero de 2016 preparó el documento *PPR 468*, donde hizo constar los artículos desaparecidos.[43]

Como parte de su investigación, pudo observar los videos recuperados de las cámaras de seguridad. Así, narró que:

> *Esas cámaras ilustraron … la manera que dos individuos llegaron, este entraron a la marquesina, este cerraron la puerta de garaje. Estuvieron dentro aproximadamente varios minutos, salieron por la puerta, abrieron el garaje, este hubo un forcejeo. Hubo un forcejeo al frente de la residencia. Este ilustra también, la manera, la forma en que un individuo le da un tiro al, al señor Edgardo Rivera Osorio. Y la manera que, que el occiso, él se queja, lo que hace, posteriormente que le dan el tiro, lo que hace que cruza a la residencia donde están las cámaras y ahí se queda en el piso y en la forma que se lo llevan, este la vecina del frente se lo lleva en el carro lo monta en el carro y se lo llevan para lo, para lo tratan, transportan al hospital de Río Grande. [sic].[44]*

Describió la "escena dos" y la forma en que se encontraba el cuerpo de la víctima.[45] Especificó, que reflejaba un orificio en el área izquierda del pecho que podía apreciarse mediante las fotos.[46]

Declaró que, luego de que la señora López Agosto y a su hija mayor, observaran las cámaras de seguridad en una pantalla grande, adquirió una información que lo llevó a citar al apelante para entrevistarlo. En lo pertinente, expresó:

> *Ahí le iban a enseñar el video, verdad este una pantalla grande, a ver si de … esas gestiones podíamos adquirir alguna información[.] … Este, sí adquirimos una información … de esas gestiones que hicimos. [sic].[47]*
> *Ese día procedimos a tratar de citar… él, este que está aquí. Al señor Javier Elías Calcaño Brignoni.[48]*

Sobre la entrevista al acusado Calcaño Brignoni, testificó que lo citó al Cuartel General,[49] y que previo a la entrevista le realizó las debidas advertencias de ley,[50] le explicó sus derechos.[51] El señor Calcaño Brignoni inició y firmó el documento que contenía dichas advertencias.[52] Se

---

[39] *Id.*, a las págs. 229 – 230.
[40] *Id.*, a la pág. 230.
[41] *Id.*, a las págs. 230 – 232.
[42] *Id.*, a la pág. 243.
[43] *Id.*, a las págs. 243 – 244.
[44] *Id.*, a la pág. 246.
[45] *Id.*
[46] *Id.*, a la pág. 248.
[47] TPO, Vista del 23 de septiembre de 2020, a la pág. 276.
[48] *Id.* En ese momento identificó al acusado en corte abierta.
[49] *Id.*
[50] *Id.*, a la pág. 277.
[51] *Id.*, a las págs. 280 – 281.
[52] *Id.*, a las págs. 281 – 283.

aseguró que el apelante entendió sus derechos, le preguntó acerca de los hechos del 6 de enero de 2016, a lo que respondió que estaba dispuesto a narrar lo ocurrido.[53] Así, narró lo ocurrido el 6 de enero de 2016 hasta que se marchó en el vehículo que estaba esperándolo.[54]

Luego de terminar la entrevista, contactó a la fiscal Rosario Figueroa.[55] Recalcó que al señor Calcaño Brignoni no se le ofreció nada a cambio por prestar su declaración.[56] Referente a la entrevista realizada por la fiscal Rosario Figueroa, expresó que la fiscal le hizo las advertencias antes de comenzar el interrogatorio, y el apelante se mantuvo cooperador.[57]

En cuanto al testimonio grabado en CD de la vista preliminar para juicio que el señor Calcaño Brignoni brindó como testigo de cargo, fue escuchado en sala y corroborado por el agente Lebrón Alicea.[58]

En el contrainterrogatorio,[59] declaró que el señor Calcaño Brignoni llegó al Cuartel General luego de que unos agentes del CIC acudieran a su residencia. Negó que el apelante fuera intimidado por los agentes. Reconoció que el acusado no mencionó los artículos identificados como desaparecidos por la señora López Agosto.

En el redirecto, explicó que el señor Calcaño Brignoni llegó al Cuartel General a las 2:00 p.m., luego le hizo las advertencias, y tras obtener sus admisiones, se comunicó con los fiscales.[60]

**7. Sra. Laura Jiménez Vega** ("señora Jiménez Vega").

La señora Jiménez Vega es la coordinadora del programa *For the record*, encargada de grabar en un disco compacto ("CD") la regrabación de la Vista Preliminar para Juicio, celebrada contra Abdiel Ilarraza Marcano, Kevin A. Nieves Encarnación y Peter Giovanny Burgos Figueroa en los casos *NSCR201600786* y *NSCR201600787*.[61]

**8. Dra. Rosa María Rodríguez Castillo**, patóloga forense del Instituto de Ciencias Forenses de P.R. ("Dra. Rodríguez Castillo").

Preparó el *Informe Médico – Forense PAT-0123-16*, el cual correspondía a la autopsia que realizó al cuerpo del occiso, señor Rivera Osorio.[62]

El cuerpo de la víctima tenía una herida de bala, compatible con que el occiso estaba parado y "de frente" cuando recibió el disparo.[63]

---

[53] *Id.*, a la pág. 284.
[54] *Id.*, a las págs. 285 – 302.
[55] *Id.*, a la pág. 302.
[56] *Id.*
[57] *Id.*, a la pág. 303.
[58] *Id.*, a las págs. 369 – 382. El CD de los casos *NSCR201600786* y *NSCR201600787* de la vista preliminar para juicio se admitió en evidencia bajo el Exhibit núm. 24 del Ministerio Público.
[59] TPO, Vista del 1 de octubre de 2020, a las págs. 441 – 442, 451 – 463.
[60] *Id.*, a las págs. 464 – 469.
[61] TPO, Vista del 24 de septiembre de 2020, a las págs. 311 – 317. El CD de dicha vista preliminar se admitió en evidencia bajo el Exhibit núm. 24 del Ministerio Público.
[62] *Id.*, a las págs. 323 – 324.
[63] *Id.*, a la pág. 348.

La causa de muerte del señor Rivera Osorio fue por homicidio, provocado por una herida de bala al corazón.[64]

En el <u>contrainterrogatorio</u>, expresó que la víctima podría estar parado o arrodillado cuando recibió el disparo.[65]

**9. Fiscal Marieli Rosario Figueroa** – Fiscal a cargo de la investigación del caso.

Declaró que el 6 de enero de 2016 llegó a la residencia del occiso,[66] y al examinar el interior, encontraron una gorra que no pertenecía a los miembros del hogar.[67] El cuarto matrimonial estaba desordenado y no pudieron encontrar unos objetos pertenecientes al occiso, señor Rivera Osorio.[68]

En la "segunda escena", vio el cuerpo del occiso dentro del vehículo, el cual presentaba una herida en el pecho.[69]

Sobre los videos de las cámaras de seguridad, declaró, que se podía apreciar que dos individuos entraron a la residencia por la marquesina, mientras apuntaban al señor Rivera Osorio con sus armas.[70] Manifestó que, luego hubo un forcejeo entre un individuo y el señor Rivera Osorio, después se vio una chispa, y a la víctima aguantándose...[71]

Identificó al apelante en corte abierta. Declaró que el acusado le brindó una declaración jurada sobre lo que ocurrió el día 6 de enero de 2016.[72]

Referente a la declaración jurada, relató que el señor Calcaño Brignoni lucía muy bien, y había comido.[73] Adujo, que al ver que el apelante era responsivo, coherente y capaz, comenzó a leer las advertencias, para asegurarse de que no se le quedara ninguna.[74] En lo pertinente, expresó:

*[P]ues, comienzo a decirle que él tiene derecho a permanecer callado. Que si él sabía, que permanecer callado es quedarse callado y no decirme nada. Me dijo que sí, que él entendía eso. Que si él sabía que todo lo que él me dijera, yo lo podía utilizar en su contra, pues, me dijo que estaba claro, que sí, que él lo sabía. Eh, incluso le comenté que si yo lo podía utilizar en un proceso criminal en contra de él. Él me dijo que sí, que el entendía que yo podía utilizar esto eh, eh en lo que él me dijera en un proceso en contra de él. Y le dije que tenía derecho a estar acompañado por un abogado o consultar un abogado antes de que decidiera hablar conmigo. Me dijo que, para que lo asesorara en el... "Ininteligible". Me dice que sí, que él sabe que puede, que entiende eso, que entiende que puede estar asesorado por un, eh, abogado. Le digo que si no tiene dinero yo puedo hacer los esfuerzos para conseguir un abogado para que lo asesore antes de que hable conmigo. Pues me dice que entiende lo que le estoy diciendo. Eh, le pregunto que, que si él, aun así decide contestar mis preguntas, y como está al frente mío... estar asistido de un*

---

[64] *Id.*, a las págs. 348 – 349.
[65] *Id.*, a la pág. 365.
[66] TPO, Vista del 30 de septiembre de 2020, a las págs. 390 – 391.
[67] *Id.*, a las págs. 392 – 393.
[68] *Id.*, a la pág. 393.
[69] *Id.*, a las págs. 394 – 395.
[70] *Id.*, a la pág. 396.
[71] *Id.*
[72] *Id.*, a las págs. 396 – 397.
[73] *Id.*, a la pág. 402.
[74] *Id.*, a las págs. 402 – 403.

*abogado, pues él, eh, puede negarse en cualquier momento a seguir contestando mis preguntas o pedir... "Ininteligible" en la asistencia de un abogado, le digo que si ese deseo de hablar conmigo sobre los hechos fue producto de, de la aporía de la intimidación, de la coacción, que si alguien lo había obligado a que él hablara conmigo, aunque él me dijera que no es cuestión del caso que si alguien lo había coaccionado, que si esa, esa declaración o ese hecho de hablar conmigo era libre... "Ininteligible" que nadie lo estuviese obligado. Que nadie le esté, ofre..., eh, le estuviese ofreciendo nada a cambio. Y él me expresa que sí. De hecho, le digo que si él, él ha entendido todos los derechos y él me comenta que sí, que sabía cuál era, eh, sus derechos porque él había tenido un caso anteriormente y, eh... "Ininteligible" y, y sabía, y conocía el proceso. Así que entonces, eh, le digo que sus deberes aun que a pesar de haberle, eh, explicado todos los estos derechos que lo... "Ininteligible" y aun desea todavía hablar conmigo. Me dice que sí, que quería, eh, declarar y hablar conmigo. [sic].*[75]

En el <u>contrainterrogatorio</u>, aceptó que en la escena se ocuparon "unos cuantos casquillos" y un proyectil enterrado en donde ocurrió el forcejeo.[76] Reconoció, que el señor Calcaño Brignoni mencionó un solo disparo en su declaración jurada.[77]

En el transcurso de la presentación de la prueba, el señor Calcaño Brignoni solicitó la supresión de toda declaración, admisión y confesión suya por alegadamente haberse obtenido de manera ilegal. El TPI anotó la posición de la Defensa y no resolvió dicha petición en ese momento.[78]

En su turno, la Defensa del señor Calcaño Brignoni presentó el testimonio de dos (2) testigos. El primero, fue brindado por la *Sra. Mariel Candelaria Gorbea,* quien es Administradora del Banco de Datos de ADN del Negociado de Ciencias Forense.[79] En específico, declaró que solo un corte camisa, era compatible con el ADN del Sr. Rubén Ruiz Martínez, quien está registrado como ofensor en la Base de Datos de ADN del estado de la Florida.[80] En el contrainterrogatorio del Ministerio Público,[81] aceptó que, el hecho de que una pieza de evidencia no arroje rastros de ADN de un

---

[75] *Id.*
[76] *Id.*, a las págs. 424 – 425.
[77] *Id.*, a la pág. 425.
[78] TPO, Vista del 1 de octubre de 2020, a las págs. 478 – 479.
[79] *Id.*, a las págs. 481 – 490.
[80] *Id.*, a la pág. 484.
[81] *Id.*, a las págs. 485 – 487.

sospechoso, no significa que la persona no hubiese estado en el lugar.[82]

El segundo testigo, fue la *Sra. Ruth Cardona Lugo,* seróloga del Ciencias Forense, quien examinó unos cortes de la camisa blanca, marca Wrangler de para realizarle pruebas de ADN.[83] En específico, los resultados no fueron compatibles con —el occiso Rivera Osorio, ni con Abdiel Ilarraza Marcano ni el apelante—.[84] En el contrainterrogatorio del Ministerio Público, aceptó que si una persona no deja suficiente ADN en el lugar, ello no significa que no estuvo allí.[85]

El **23 de noviembre de 2020** el caso quedó sometido ante el TPI, por lo que emitió un fallo de culpabilidad en todas las acusaciones presentadas contra el acusado Calcaño Brignoni.

Por consiguiente, el **3 de febrero de 2021** fue dictada la sentencia fijando una **pena de reclusión de 129 años**.[86] En lo pertinente, determinó:

> *[E]ste Tribunal en cumplimiento del **fallo de culpabilidad** emitido el **23 de noviembre de 2020** en el juicio en sus méritos y contando con el beneficio del informe pre-sentencia, dicta la siguiente Sentencia:*
>
> - *EN EL CASO <u>NSCR201700172 POR ART. 93(B) CP (1ER. GRADO) (2012)</u>, SE LE CONDENA A LA PENA DE: **<u>NOVENTA Y NUEVE (99) AÑOS DE CÁRCEL</u>**<u>, A CUMPLIRSE EN LA INSTITUCIÓN PENAL QUE DISPONGA EL DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN</u>;*
>
> - *EN EL CASO <u>NSCR201700173 POR ART. 190(D) CP GRAVE (2012)</u>, SE LE CONDENA A LA PENA DE: **<u>VEINTICINCO (25) AÑOS DE CÁRCEL</u>**<u>, A CUMPLIRSE EN LA INSTITUCIÓN PENAL QUE DISPONGA EL DEPARTAMENTO DE CORRECCIÓN Y EHABILITACIÓN</u>;*
>
> - *EN EL CASO <u>NSCR201700175 POR ART. 5.04 LA GRAVE (2000)</u>, SE LE CONDENA A LA PENA DE: **<u>DIEZ (10) AÑOS DE CÁRCEL QUE</u>**<u>, A TENOR CON EL ARTÍCULO 703 DE LA LEY DE ARMAS</u>, **<u>SE DUPLICA A VEINTE (20) AÑOS DE CÁRCEL</u>**<u>, A CUMPLIRSE EN LA INSTITUCIÓN PENAL QUE DISPONGA EL DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN</u>;*

---

[82] *Id.*, a la pág. 487.
[83] TPO, Vista del 23 de noviembre de 2020, a las págs. 497 – 498.
[84] *Id.*, a las págs. 498 – 499.
[85] *Id.*, a las págs. 503 – 505.
[86] Apéndice VI del *Alegato del Apelante*, págs. 17 – 18.

- *EN EL CASO <u>NSCR201700176 POR ART. 5.15 LA GRAVE (2000)</u>, SE LE CONDENA A LA PENA DE: **CINCO (5) AÑOS DE CÁRCEL QUE**, A TENOR CON EL ARTÍCULO 7.03 DE LA LEY DE ARMAS, **SE DUPLICA A DIEZ (10) AÑOS DE CÁRCEL**, A CUMPLIRSE EN LA INSTITUCIÓN PENAL QUE DISPONGA EL DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN;*

- *LAS PENAS IMPUESTAS EN LOS CASOS NSCR201700172 Y NSCR201700173, SE CUMPLIRÁN DE FORMA CONCURRENTES ENTRE SÍ, CONSECUTIVAS CON LAS PENAS IMPUESTAS. EN LOS CASOS NSCR201700175 Y NSCR201700176, CONSECUTIVAS CON CUALQUIER OTRA PENA, SI ALGUNA ESTUVIERE CUMPLIENDO.*

- *LAS PENAS IMPUESTAS EN LOS CASOS NSCR201700175 Y NSCR201700176 SE CUMPLIRÁN DE FORMA CONSECUTIVAS ENTRE SÍ, CONSECUTIVAS CON LAS PENAS IMPUESTAS EN LOS CASOS NSCR2OI700172 Y NSCR201700173, Y CONSECUTIVAS CON CUALQUIER OTRA PENA, SI ALGUNA ESTUVIERE CUMPLIENDO.*

- *ABÓNESE EL TIEMPO CUMPLIDO EN PREVENTIVA.*

- *SE EXIME DEL PAGO DE LA PENA ESPECIAL POR SER REPRESENTADO MEDIANTE ASIGNACIÓN DE ABOGADO DE OFICIO.*[87]

Inconforme con el dictamen, el apelante presentó una moción de reconsideración; la cual, fue declarada *No Ha Lugar* el **22 de febrero de 2021**.[88]

El **19 de marzo de 2021** el señor Calcaño Brignoni presentó el recurso de apelación que nos ocupa. Luego de varios trámites procesales, el **23 de octubre de 2023** fue sometido el *ALEGATO DEL APELANTE*. Allí, señaló la comisión de once (11) errores:

(1) *Erró el Honorable Tribunal de Primera Instancia al no suprimir todas las admisiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas en violación a la Constitución de los Estados Unidos de Norteamérica y la Constitución del Estado Libre Asociado de Puerto Rico.*

(2) *Erró el Honorable Tribunal de Primera Instancia al no suprimir todas las admisiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas producto de un arresto ilegal y fueron fruto del árbol ponzoñoso. Véase Pueblo v. Nieves 188 DPR 1 (2013).*

(3) *Erró el Honorable Tribunal de Primera Instancia al no suprimir todas las admisiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas en violación a Pueblo v. Millán Pacheco, 182 DPR 595 (2012).*

---

[87] *Subrayado y énfasis nuestro.*
[88] Notificada el 23 de febrero de 2021.; *Véase*, Apéndice VI del *Alegato del Apelante*, pág. 19.

(4) *Erró el Honorable Tribunal de Primera Instancia al no suprimir todas las admisiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas en violación a Miranda v. Arizona, 84 U.S. 436 (1966).*

(5) *Erró el Honorable Tribunal de Primera Instancia al no sancionar de forma alguna al Ministerio Publico, suprimiendo las confesiones de Javier Calcaño Brignoni o de cualquier otra manera, por incumplir con el acuerdo de inmunidad expreso y/o tácito perfeccionado con el señor Javier Calcaño Brignoni.*

(6) *Erró el Honorable Tribunal de Primera Instancia al no suprimir las confesiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas mediante coacción, amenaza, treta, engaño, dolo, mala fe y una estrategia deliberada para que confesara y luego presentarle cargos criminales a pesar de haberse comprometido expresa y/o tácitamente a no presentarle cargos como cuestión de hecho y de derecho.*

(7) *Erró el Honorable Tribunal de Primera Instancia al no suprimir las confesiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque fueron obtenidas mediante coacción, amenaza, treta, engaño, dolo, mala fe y la creencia de que se le concedería inmunidad. Véase Pueblo v. De Jesús Alvarado 148 D.P.R. 9955 (1999.*

(8) *Erró el Honorable Tribunal de Primera Instancia al no suprimir las confesiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, a pesar de este haber cumplido con su obligación contractual de ser testigo del pueblo a cambio de que no se le presentarían cargos criminales.*

(9) *Erró el Honorable Tribunal de Primera Instancia al no suprimir las confesiones realizadas por el señor Javier Calcaño Brignoni y admitirlas en su contra, porque el Estado estaba impedido de ir contra de sus propios actos, luego de haberse comprometido expresa y/o tácitamente a no presentarle cargo como cuestión de hecho y de derecho.*

(10) *Erró el Honorable Tribunal de Primera Instancia al emitir un fallo de culpabilidad porque de un examen ponderado de la prueba desfilada ante el tribunal de primera instancia surge duda razonable y fundada sobre si la culpabilidad del señor Javier Calcaño Brignoni fue establecida más allá de duda razonable.*

(11) *Erró el Honorable Tribunal de Primera Instancia al emitir un fallo de culpabilidad porque de los análisis serológicos de ADN, el señor Javier Calcaño Brignoni, fue excluido como donante del material genético que fue levantado de la escena.*

El **12 de diciembre de 2023**, compareció la *Oficina del Procurador General* representado al *Pueblo de Puerto Rico*, mediante "*ALEGATO DE EL PUEBLO".*

El **15 de diciembre de 2023** ordenamos al TPI a elevar los autos originales, y el **19 de diciembre de 2023**, dimos por cumplida nuestra orden. Así, el recurso de epígrafe quedó perfeccionado para la consideración del Panel Especial.

**-II-**

**-A-**

En lo que respecta al recurso de apelación criminal, se ha expresado que la determinación que hizo el juzgador de los hechos de la culpabilidad del acusado más allá de duda razonable es revisable en apelación por tratarse de un asunto tanto de hecho como de derecho.[89]

No obstante, dado que le corresponde al jurado o, en su defecto, al juez dirimir los conflictos de prueba, no es aconsejable intervenir en tales determinaciones, *en ausencia de pasión, prejuicio, parcialidad o error manifiesto*.[90]

Por lo tanto, la determinación de culpabilidad que hace el juzgador de los hechos a nivel de instancia, ya sea en un juicio por jurado o por tribunal de derecho, es merecedora de una *gran deferencia por parte del tribunal apelativo*.[91]

Esa presunción de corrección que acompañan las actuaciones de los tribunales de instancia, *le compete al apelante la obligación de demostrar lo contrario*.[92]

Para ello, es necesario señalar el error y fundamentarlo en cuanto a los hechos y la fuente del derecho que la sustentan; de esa forma, podrá el foro apelativo estar en posición de atender los reclamos que allí se plantean. *De ahí, la importancia de la reproducción de la prueba oral, ya que sin ella, los foros apelativos*

---

[89] *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011).
[90] *Id. Énfasis nuestro.*
[91] *Id. Énfasis nuestro.*
[92] *Pueblo v. Prieto Maysonet,* 103 DPR 102, 107 (1974). *Énfasis nuestro.*

*están impedidos de descartar la apreciación de la prueba que realizó el tribunal de instancia.*[93]

**-B-**

En lo concerniente al ***quantum*** de prueba en los casos criminales, constituye un principio fundamental que la culpabilidad de todo acusado de delito debe ser probada ***más allá de duda razonable***. Este principio es consustancial con el principio de la presunción de inocencia, y es un elemento del debido proceso de ley. Así, el peso de la prueba permanece sobre el Estado durante **todas** las etapas del proceso a nivel de instancia.[94]

Es decir, en nuestro sistema de justicia criminal el Ministerio Público tiene la obligación de presentar suficiente evidencia sobre ***todos los elementos del delito y su conexión con el acusado a fin de establecer la culpabilidad de este más allá de duda razonable***.[95] En ese sentido, la prueba de identificación del autor del delito está enmarcada en la ***totalidad de las circunstancias y la confiabilidad que al juzgador le merezca***.[96] No obstante, la determinación de suficiencia de la prueba, que evidencie la culpabilidad del acusado *más allá de duda razonable*, es una ***cuestión de conciencia***, producto de ***todos*** los elementos de juicio del caso y no meramente una duda especulativa o imaginaria.[97] Con el fin de explicar este concepto, el Tribunal Supremo ha expresado que:

> *[D]uda razonable es aquella duda fundada que surge como producto del raciocinio de todos los elementos de juicio involucrados en el caso. Para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación. En resumidas cuentas, **duda razonable no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada**.*[98]

---

[93] *Pueblo v. Calderón Hernández,* 145 DPR 603, 605-606 (1998).
[94] *Pueblo v. Rodríguez Pagán, supra* a la pág. 258.
[95] *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011).
[96] *Pueblo v. Toro Martínez,* 200 DPR 834, 864-865 (2018).
[97] *Pueblo v. Irizarry,* 156 DPR 780 (2002).
[98] *Id.,* pág. 788. *Énfasis nuestro.* Casos citados omitidos.

**-C-**

En cuanto a las acusaciones del presente caso, comencemos con el Artículo 93 inciso (b) del *Código Penal de 2012*,[99] sobre el asesinato en primer grado. En lo pertinente, dispone:

> *Constituye asesinato en primer grado:*
> *(a) …*
> *(b) **Todo asesinato causado al perpetrarse o intentarse algún delito de** incendio agravado, agresión sexual, **robo**, escalamiento agravado, secuestro, secuestro de un menor, estrago (excluyendo la modalidad negligente), envenenamiento de aguas de uso público (excluyendo la modalidad negligente), agresión grave, fuga, maltrato (excluyendo la modalidad negligente), abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la "Ley para la Protección e Intervención de la Violencia Doméstica".*
> *(c) …*
> *[…]*
> **Toda** *otra muerte intencional de un ser humano constituye asesinato en segundo grado.[100]*

Nótese que, para configurar el delito de asesinato en primer grado, se debe cumplir con dos elementos genéricos: *(1) el dar muerte a un ser humano, y (2) a propósito, con conocimiento o temerariamente.*[101]

En cuanto al delito de **robo agravado**, primero debemos determinar qué constituye **robo** bajo el Artículo 189 del *Código Penal de 2012:*

> *Toda persona que se apropie ilegalmente de bienes muebles pertenecientes a otra, sustrayéndolos de la persona en su inmediata presencia y contra su voluntad, **por medio de violencia o intimidación, o inmediatamente después de cometido el hecho emplee violencia o intimidación sobre una persona para retener la cosa apropiada**, será sancionada con pena de reclusión por un término fijo de quince (15) años.*[102]

Nótese, que el victimario debe ejercer el elemento de violencia o intimidación sobre la víctima, para que se configure el delito de robo.

---

[99] Ley Núm. 146 de 30 de julio de 2012, según enmendada, conocida como *"Código Penal de Puerto Rico" de 2012*. 33 LPRA sec. 5142.
[100] 33 LPRA sec. 5142. *Énfasis nuestro.*
[101] *Véase*, 33 LPRA sec. 5141.
[102] 33 LPRA sec. 5259.

En consecuencia, el Artículo 190 del *Código Penal de 2012* establece el **robo agravado** como aquel delito de robo (antes descrito en el Artículo 189) que se comete en cualquiera de las siguientes circunstancias:

> *(a) cuando se vale de un menor que no ha cumplido dieciocho (18) años de edad;*
> *(b) cuando el bien objeto del delito es un vehículo de motor;*
> *(c) cuando en el curso del robo se le inflige daño físico a la víctima;*
> *(d) <u>cuando ocurre en un edificio ocupado donde esté la víctima o en cualquier otro lugar donde ésta tenga una expectativa razonable de intimidad</u>;*
> *(e) <u>cuando medie el uso de un arma de fuego en la comisión del delito</u>; o*
> *(f) cuando la víctima o víctimas sean amarradas, amordazadas o se limite su libertad de movimiento durante la comisión del delito.[103]*

En otras palabras, el robo se agrava cuando ocurre una de las circunstancias antes descritas, por lo que establece una pena de reclusión por un término fijo de veinticinco (25) años.[104]

En cuanto a los delitos por armas de fuego, es de aplicación la derogada Ley Núm. 404–2000 conocida como la *Ley de Armas de Puerto Rico* ("Ley de Armas"),[105] ya que los hechos imputados fueron cometidos durante la vigencia de dicha ley.

Sobre la portación ilegal de un arma de fuego sin licencia, en lo pertinente, el Artículo 5.04 de la Ley de Armas, dispone que:

> *Toda persona que **transporte** cualquier arma de fuego o parte de ésta, **sin tener una licencia de armas**, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, **incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años**. […].[106]*

El aludido Artículo 5.04 dispone una pena fija de 10 años a quien incurra y sea convicta por transportar un arma de fuego.[107] Entiéndase, la mera transportación de un arma de fuego o parte de ella, sin tener licencia o permiso, constituye un delito grave. La pena fija podrá ser reducida hasta un mínimo de 5 años o, aumentada

---

[103] 33 LPRA sec. 5260. *Énfasis nuestro.*
[104] *Id.*
[105] 25 LPRA ant. sec. 455 *et seq.*
[106] 25 LPRA ant. sec. 458c
[107] *Id.*

hasta un máximo de 20 años, ello dependerá de las circunstancias atenuantes o agravantes aplicables al caso.[108] Además, se considerará circunstancia agravante *"[c]ualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa".*[109]

Examinemos ahora el Artículo 5.15 de la Ley de Armas.[110] En específico, el inciso (A) establece lo siguiente:

> **(A)** *Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:*
> > **(1)** *voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o*
> > **(2)** *intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.*
> > *De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.*
> > *Disponiéndose que, aquella persona que cometa el delito descrito en el inciso (1) anterior, utilizando un arma de fuego y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.*
> > *Del mismo modo, cuando una persona cometa el delito descrito en el inciso (2) anterior, utilizando un arma de fuego, mediando malicia y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.*[111]

Nótese que este artículo establece las siguientes dos (2) modalidades en que una persona puede **disparar o apuntar ilegalmente un arma de fuego**; a saber: **(1) voluntariamente dispare** cualquier arma en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, aunque no le

---

[108] *Id.*
[109] *Id.*
[110] 25 LPRA ant. sec. 458n.
[111] *Id.*

cause daño a persona alguna; o **(2) intencionalmente**, aunque sin malicia, **apunte** hacia alguna persona con un arma, aunque no le cause daño a persona alguna.

Si se comete este delito —**en cualquiera de las dos modalidades**— la pena de reclusión será por un término fijo de cinco (5) años. De mediar circunstancias agravantes, la pena podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un máximo de un (1) año.

Por último, el Artículo 7.03 de la Ley de Armas es un agravamiento de las penas contempladas en esta Ley.[112] El primer párrafo, el agravamiento está dirigido hacia convicciones previas o coetáneas con las siguientes leyes:

> *Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción este asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 4.04 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena dispuesta en esta Ley. […].*[113]

El segundo párrafo, el agravamiento está relacionado al modo en que se cumplirá la pena, y a circunstancias específicas en cuanto a convicciones previas y los daños causados, que tienen el efecto de duplicar la pena. A continuación, establece:

> *[T]odas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley **o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental**, la pena establecida para el delito se duplicará. Toda violación a esta Ley en una zona escolar o universitaria según definida en el Artículo 1.02, conllevará el doble de la pena establecida.*[114]

---

[112] 25 LPRA ant. sec. 460b.
[113] *Id.*
[114] *Id.* Énfasis nuestro,

**-D-**

En este apartado, discutiremos la admisibilidad de una confesión o admisión realizada luego de un arresto ilegal, y su relación, con el derecho a no autoincriminarse.

Referente a la admisibilidad de una confesión o admisión realizada luego de un arresto ilegal, el Tribunal Supremo de Puerto Rico adoptó en *Pueblo* v. *Nieves Vives*,[115] los factores esbozados por el Tribunal Supremo Federal de EEUU en *Brown* v. *Illinois*.[116] Estos son: **1)** si se hicieron las advertencias legales, **2)** el tiempo transcurrido entre el arresto ilegal y la confesión, **3)** las causas interventoras y, **4)** el propósito y flagrancia de la conducta ilegal de los funcionarios del Estado.[117] Ciertamente, ninguno de estos factores es determinante *per se*, teniéndose que evaluar a la luz de la totalidad de las circunstancias y caso a caso.[118]

Analicemos brevemente los factores antes dicho, primer lugar, el mero hecho que se impartan las **advertencias legales** no implica que la confesión sea admisible.[119] Aunque es un factor importante, tiene que ser sopesado en conjunto con los demás. En cuanto al **tiempo entre el arresto y la confesión**, la jurisprudencia no ha sido consistente en establecer un estándar preciso.[120] No obstante, a menor tiempo entre el arresto y la confesión, se reduce la probabilidad de que existan causas interventoras. De otro lado, el factor de la **causa interventora** busca eventos que puedan interrumpir la cadena entre el arresto ilegal y la confesión.[121] Dicha causa interventora tiene que ser *"un suceso externo e independiente a la ilegalidad del arresto"*.[122] Tales como: consultar un abogado,

---

[115] 188 DPR 1 (2013).
[116] 422 US 590 (1975)
[117] *Pueblo* v. *Nieves Vives, supra*, pág. 22.; *Brown v. Illinois, supra*, págs. 603 – 604.
[118] *Pueblo* v. *Nieves Vives, supra*, pág. 21.
[119] *Id.*, a la pág. 23.
[120] *Id.*, a la pág. 24.
[121] *Id.*
[122] *Id.*

manifestación espontánea, o dar por concluida la detención ilegal.[123] Por último, y de mayor trascendencia, la **conducta del Estado** no puede constituir un intento de beneficiarse de sus actuaciones ilegales. A saber, debe evaluarse si la actuación ilegal del arresto iba dirigida a obtener la confesión.[124]

> *En esencia, este factor establece que para que la confesión o admisión obtenida ilegalmente pueda prevalecer como prueba sustantiva, debe surgir de la evidencia presentada por el Ministerio Público que la acción de los funcionarios que llevaron a cabo el arresto ilegal no iba dirigida a obtener la admisión o confesión producto de la intervención para la cual no tenían motivos fundados.[125]*

Lo antes dicho, está relacionado con el derecho contra la autoincriminación que dimana de la Quinta Enmienda de la Constitución Federal, que dispone en su parte pertinente: *"[n]o person... shall be compelled in any criminal case to be a witness against himself..."*.[126] De igual forma, el Artículo II, Sección 11 de nuestra Constitución establece que *"[n]adie será obligado a incriminarse mediante su propio testimonio..."*.[127] En virtud de este privilegio se promueve que el Gobierno realice sus investigaciones criminales civilizadamente y que el sistema judicial no se contamine con métodos que lesionen la dignidad humana.[128]

Este precepto constitucional cumple varios propósitos, entre ellos: **(1)** promover investigaciones civilizadas por parte del Gobierno, **(2)** evitar que una persona tenga que decidir escoger entre decir la verdad y acusarse a sí mismo.[129] Sin duda, *"constituye la protección más importante con la que cuenta todo ciudadano que enfrenta un interrogatorio como parte de una investigación criminal"*.[130]

---

[123] *Id.*, a las págs. 24 – 25.
[124] *Id.*, a las págs. 22-26.
[125] *Id.* pág. 25.
[126] Eda. V., Const. EE.UU., LPRA, Tomo 1.
[127] Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1.
[128] *Véase*, E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, 1era ed., Colombia, Ed. Fórum, 1991, Vol. I, pág. 118.
[129] *Pueblo v. Sustache Torres*, 168 DPR 350, 354 (2006).
[130] *Pueblo v. Millán Pacheco*, 182 DPR 595, 608 (2011).

En ese sentido, el derecho contra la autoincriminación no es absoluto ni opera automáticamente.[131] En estos casos, la declaración será admisible, aun cuando el Estado no haya hecho previamente las advertencias de ley.[132] Incluso, si el sospechoso hace una confesión o admisión voluntaria o espontánea, el agente del orden público no tiene que interrumpirle para hacerle las advertencias de ley.[133]

Este derecho, sin embargo, es renunciable, siempre y cuando dicha renuncia sea inteligente, voluntaria y sin coacción o violencia por parte del Estado.[134] Al respecto, una vez la investigación criminal se centra sobre una persona sospechosa del delito investigado, los agentes del orden público están obligados a advertirle inmediatamente al individuo de una serie de derechos constitucionales, previo a interrogarlo.[135] Dichas advertencias incluyen: **(a)** el derecho a guardar silencio; **(b)** que cualquier manifestación que realice podrá y será utilizada en su contra; **(c)** el derecho a consultar con un abogado durante el interrogatorio; y **(d)** el derecho a que se le asigne un abogado de oficio, de ser indigente.[136] Las advertencias legales no deben ser facilitadas utilizando un lenguaje talismánico. Meramente se requiere que el sospechoso entienda las implicaciones de su renuncia.[137]

Este derecho se activa cuando: **1)** el Estado obliga a alguien, **2)** a incriminarse **3)** mediante su propio testimonio.[138] En lo que nos concierne, nuestro Máximo Foro ha expresado que el primero de los tres criterios –que el Estado obliga a una persona– solo abarca declaraciones compelidas, por lo que las confesiones voluntarias

---

[131] *Pueblo v. Viruet Camacho*, 173 DPR 563, 571 (2008).
[132] *Id.*, a la pág. 572
[133] *Id.*
[134] *Pueblo v. Pérez Rivera*, 186 DPR 845 (2012).
[135] *Miranda v. Arizona*, 348 US 436 (1966).; *Pueblo v. De Jesús*, 148 DPR 995 (1999).
[136] *Id.*
[137] *Pueblo v. Viruet Camacho, supra*, a la pág. 574.
[138] *Miranda v. Arizona, supra.*; *Pueblo v. Sustache Torres, supra*, a la pág. 354.

ofrecidas por el sospechoso son admisibles en evidencia.[139] En otras palabras, para que exista una violación al derecho contra la autoincriminación es necesario que la declaración del sospechoso sea obtenida mediante coerción, pues, si fue voluntaria, no le asiste protección alguna.[140]

A la luz de esta normativa, una confesión o admisión es inadmisible por violar el derecho contra la autoincriminación, cuando se satisfacen los siguientes requisitos: **1)** al momento de obtenerse la declaración impugnada ya la investigación se haya enfocado sobre la persona en cuestión y esta sea considerada como sospechosa en la comisión del delito; **2)** al momento de prestar la declaración el sospechoso se encuentra bajo custodia del Estado; **3)** al momento de prestar la declaración esta haya sido producto de un interrogatorio realizado con el fin de obtener manifestaciones incriminatorias; **4)** que no se le haya advertido sobre los derechos constitucionales que nuestro ordenamiento le garantiza.[141]

Si el Estado incumple con impartir las advertencias que anteceden, procederá la supresión de cualquier declaración incriminatoria hecha por el acusado. Por ende, para poder reclamar con éxito una violación a las normas establecidas en *Miranda v. Arizona, supra,* es indispensable la concurrencia de los siguientes criterios: **(1)** la persona se incriminó durante un interrogatorio por parte del Estado, **(2)** al efectuarse dicho interrogatorio, la persona era considerada sospechosa del delito que se investiga, y **(3)** el sospechoso estaba bajo la custodia del Estado.[142]

En cuanto al último criterio –si el sospechoso estaba bajo la custodia del Estado– es necesario evaluar *"todas las circunstancias*

---

[139] *Pueblo v. Sustache Torres, supra.*
[140] *Id.*
[141] *Pueblo v. Viruet Camacho, supra,* a la pág. 574.
[142] *Pueblo v. Millán Pacheco, supra,* a las págs. 612-613.

*que rodean el interrogatorio y la consideración objetiva de cómo una persona razonable hubiera entendido su situación".*[143]

Cuando exista una controversia en cuanto a la voluntariedad de una confesión, **el Estado tiene el peso de la prueba** a la hora de afirmar la validez de la renuncia al derecho a la autoincriminación. Esto es, la evidencia que presente en apoyo de la admisibilidad debe ser conducente a demostrar que las advertencias legales se efectuaron y que no medió coacción al momento de prestar la confesión.[144]

### -III-

El señor Calcaño Brignoni nos señala **once (11) errores** incurridos por el TPI, no obstante, se resumen en dos grupos; a saber: en los **primeros nueve (9) errores** cuestiona el proceder del foro apelado al no suprimir las admisiones realizadas en su confesión, a pesar de estar en violación al estado de derecho vigente y ser obtenidas con engaños e incumpliendo un alegado acuerdo de inmunidad. En el segundo grupo, —**errores diez (10) y (11) once**— cuestiona que, la prueba presentada por el Pueblo no probó su culpabilidad más allá de duda razonable. No tiene razón.

Comencemos con el **primer grupo de errores**. En síntesis, el apelante plantea que sus admisiones y confesión fueron producto de un arresto ilegal, pues luego de la entrevista a la señora Rivera López —esposa del occiso— y la hija mayor, pasó a ser sospechoso sin tener motivos fundados.

La prueba presentada por el Ministerio Público consistió en que para finales del mes de julio de 2016, el Agte. Lebrón Alicea citó al Cuartel General a la esposa del occiso —señora López Agosto— y la hija mayor —Grace Lee Rivera López— para examinar en una **pantalla grande** las imágenes obtenidas de las cámaras de

---

[143] *Id.*, a la pág. 620.
[144] *Pueblo v. Viruet Camacho, supra.*

seguridad del vecino (Sr. Manuel Maysonet). El agente utilizó una pantalla grande con el propósito de ver obtener alguna información,[145] que anteriormente no se hubiese percatado. En efecto, esa observación —junto a otras entrevistas— provocó que el Agte. Lebrón ordenara la citación del señor Calcaño Brignoni para entrevistarlo el 1 de agosto de 2016 en el Cuartel General.

No obstante, la Defensa del señor Calcaño Brignoni especula que durante el trayecto de Río Grande a Hato Rey se pudo realizar algún interrogatorio por parte de los agentes del CIC sin las debidas advertencias; además, que al limitarle la libertad de movimiento e incapacidad para macharse convirtieron sus actuaciones en un arresto ilegal.

Lo antes dicho carece de mérito, pues la prueba presentada y admitida en evidencia demostró que, al llegar el señor Calcaño Brignoni al Cuartel General de Hato Rey, alrededor de las 2 de la tarde, entonces, **antes** de iniciar el interrogatorio, el Agte. Lebrón hizo las advertencias de ley como sospechoso y las plasmó por escrito en el documento PPR 264 FORMULARIO DE ADVERTENCIAS PARA PERSONAS SOSPECHOSAS EN CUSTODIA ANTES DE HACER O RE – INICIAR UN INTERROGATORIO, el cual tiene la hora (2:30 pm), fecha (1/agosto/2016), nombre con apellidos, firma e iniciales del señor Javier E. Calcaño Brignoni; además, consta el número de placa (25883), nombre con apellidos y firma del agente José R. Lebrón Alicea.[146] Cabe añadir, que dicho

---

[145] TPO, Vista del 23 de septiembre de 2020, a la pág. 276.

[146] *Véase*, formulario de advertencias de ley, Apéndice I del *Alegato del Apelante*, pág. 1. En específico, las advertencias iniciadas y firmadas por el señor Calcaño Brignoni fueron:
> *1. Tiene el derecho a permanecer callado(a) y a rehusarse a contestar preguntas.*
> *2. Todo lo que usted diga, puede ser utilizado en su contra en un tribunal de derecho.*
> *3. Tiene el derecho de consultar con un abogado antes de hablar con un miembro de la Policía y tiene derecho a tener a un abogado presente mientras se le interroga ahora o cuando se le interrogue en el futuro.*
> *4. Si no tiene dinero para contratar a un abogado y desea uno, el estado le proveerá uno antes de cualquier interrogatorio.*

formulario fue admitido en evidencia como Exhibit 34 del Ministerio Público.[147] Todavía más, el **2 de agosto de 2016**, a la 12:00 am, la fiscal a cargo del caso Marieli Rosario Figueroa, le tomó una declaración jurada al señor Calcaño Brignoni en la cual confesó *libre y voluntariamente* su participación criminal en estos hechos. La misma fue iniciada y firmada por el apelante; además, de constar las iniciales y firma de la honorable fiscal. Dicha confesión, fue admitido en evidencia como Exhibit 25 del Ministerio Público. Es decir, dicha renuncia fue una <u>inteligente</u>, <u>voluntaria</u> y <u>sin coacción o violencia</u> por parte del Estado. Así, el señor Calcaño Brignoni estuvo dispuesto a confesar lo ocurrido sobre al asesinato del señor Rivera Osorio.[148]

No obstante, el señor Calcaño Brignoni arguye que la voluntariedad no puede ser el único factor que considerar, y añade que, al ser producto de un arresto ilegal, el Estado no cumple con los cuatro (4) factores establecido en el citado caso de *Brown v. Illinois*.[149] Reiteramos que en los hechos probados en este caso, no surge elemento alguno que podamos identificar que el señor Calcaño Brignoni fue arrestado ilegalmente, por lo cual, no es de aplicación el referido caso de *Brown*. Máxime, cuando quedó evidenciado que, **antes** de hacer —la admisión y la confesión— le fueron hechas las <u>advertencias de ley</u>, tanto por el Agte. Lebrón Alicea como por la fiscal Rosario Figueroa; y ambos funcionarios, testificaron haberse

---

*5. Si usted decide contestar preguntas ahora sin la presencia de un abogado usted siempre tendrá el derecho de detener el interrogatorio hasta que hable con un abogado.*
*5. Conociendo y entendiendo estos derechos luego de habérselos explicado, ¿usted desea contestar preguntas sin la presencia de un abogado?*
Igualmente, el apelante **certificó que le leyeron y le explicaron** las advertencias antes mencionadas. Además, marco con una X el recuadro que esbozaba lo siguiente: *"Entiendo los derechos que dichas advertencias me conceden y renuncio voluntariamente a los mismos con pleno conocimiento de que puedo detener el Interrogatorio y/o invocar mí derecho a estar asistido por un(a) abogado(a) en cualquier momento. La renuncia a estos derechos ha sido voluntaria, sin mediar coacción, intimidación, violencia, presión o promesa alguna".*
[147] TPO, Vista del 23 de septiembre de 2020, a la pág. 279.
[148] TPO, Vista del 23 de septiembre de 2020, a la pág. 284.
[149]*Pueblo* v. *Nieves Vives*, *supra*, pág. 22.; *Brown v. Illinois*, *supra*, págs. 603 – 604.

cerciorado que las entendiera, libre y voluntariamente. Nótese también, que el apelante declaró en la vista preliminar para juicio como testigo del Ministerio Público contra los entonces imputados Peter Giovanny, Kevin A. Nieves y Abdiel Ilarraza. La grabación (CD) de ese testimonio fue admitido en el Exhibit núm. 24 y escuchado en el juicio. Es decir, en las tres instancias en las que el apelante admitió su participación criminal, lo hizo libre, voluntaria y sin intimidación del Estado.

Tampoco surge de la confesión o documento alguno que el Estado haya pactado un acuerdo de inmunidad con el señor Calcaño Brignoni para que declarara sobre los hechos. Por la cual, resulta inmeritoria su argumentación en cuanto a que la conducta de los funcionarios del Estado al brindarle protección, alimentos, hospedaje y seguridad durante el periodo de cinco (5) meses, le generó una creencia de que se le concedería inmunidad.

Por su último, abordemos el **segundo grupo de errores —diez (10) y (11) once—** en el que se cuestiona, que la prueba presentada por el Pueblo, no probó la culpabilidad del señor Calcaño Brignoni más allá de duda razonable, pues únicamente se basó en la confesión; y a ello abona, que las pruebas de ADN realizadas por el Estado no fueron compatible con su perfil genético. Tampoco tiene razón.

Nótese, que este caso es producto de una **confesión** libre y voluntaria hecha por el señor Calcaño Brignoni, en la que **narra con detalles** su participación directa en el **robo agravado** (uso de arma de fuego/ocurrido en el hogar de la víctima), **asesinato en primer grado** (al perpetrar el delito de robo), **portación y uso ilegal de arma de fuego** (pistola Glock color negra, sin posesión de licencia) en la muerte del señor Rivera Osorio, ocurrida en su residencia ubicada en el pueblo de Río Grande. A ese fin, el Ministerio Público debía presentar **prueba independiente que corroborara** —*más allá*

*de duda razonable—* la confesión hecha por el apelante. En específico, el Pueblo presentó y fueron admitidas por el TPI **—entre otras—** evidencia testifical de nueve (9) testigos de cargo;[150] fotografías;[151] CD grabación de la vista preliminar para juicio en los casos NSCR201600786 y NSCR201600787 en que el apelante testificó;[152] Certificación de muerte del señor Edgardo Rivera Osorio por herida de bala al tórax;[153] CD videos de cámaras de seguridad;[154] PPR 264 *formulario de advertencias para personas sospechosas en custodia antes de hacer o re – iniciar un interrogatorio;[155]* Confesión mediante declaración jurada de 2 de agosto de 2016 del señor Calcaño Brignoni;[156] y, Certificación de registro de armas de fuego preparado por el perito Edgardo Rivera de Ciencias Forense.[157]

Un análisis sosegado de toda la prueba presentada por el Ministerio Público, **corrobora —más allá de duda razonable—** los hechos narrados por el señor Calcaño Brignoni en la declaración jurada del 2 de agosto de 2016. Allí, confesó haber perpetrado un robo a mano armada, junto a otra persona,[158] en la residencia del señor Edgardo Ribera Osorio, a quien le hizo un disparo en el pecho que le ocasionó la muerte. Esta prueba no quedó impugnada ante los resultados de las pruebas de ADN, en los que no hubo material genético compatible con el acusado, pues ambas testigos de la

---

[150] **Agte. Carlos D. González Díaz** (perito de Servicios Técnicos de la Policía de Puerto Rico); **Sgte. Luis D. Osorio Guzmán**; **Agte. Yanira Velázquez Ventura**; **Sra. Johanna Lee López Agosto** (esposa del occiso); **Agente Jasmine Justino Falú** (Centro de Recopilación, Análisis y Diseminación de Inteligencia Criminal de Humacao, división dedicada a la extracción de cámaras de seguridad); **Agte. José R. Lebrón Alicea** (CIC a cargo de la investigación); **Sra. Laura Jiménez Vega** (coordinadora de *For the record*, regrabó en un disco compacto la vista preliminar para juicio, en la que el apelante testificó contra Abdiel Ilarraza Marcano, Kevin A. Nieves Encarnación y Peter Giovanny Burgos Figueroa en los casos NSCR201600786 y NSCR201600787); **Dra. Rosa María Rodríguez Castillo** (patóloga forense que preparó el Informe Médico – Forense PAT-0123-16); y, **Marieli Rosario Figueroa** (fiscal a cargo de la investigación del caso).

[151] Se admitieron en evidencia 67 fotografías de la escena del crimen que fueron estipuladas por ambas partes y marcadas en bloque como Exhibit 1E – 111E del Ministerio Público.

[152] Admitido en evidencia mediante el Exhibit núm. 24 del Ministerio Público.

[153] Admitido en evidencia mediante el Exhibit núm. 2 del Ministerio Público.

[154] Admitido en evidencia mediante el Exhibit núm. 13 del Ministerio Público.

[155] Admitido en evidencia mediante el Exhibit núm. 34 del Ministerio Público.

[156] Admitido en evidencia mediante el Exhibit núm. 25 del Ministerio Público.

[157] Admitido en evidencia mediante el Exhibit núm. 22 del Ministerio Público.

[158] Abdiel J. Ilarraza Marcano.

defensa, *(Mariel Candelaria Gorbea, administradora del Banco de Datos de ADN del Negociado de Ciencias Forense y Ruth Cardona Lugo, seróloga del Ciencias Forense)*, a preguntas del Ministerio Público concluyeron que, el hecho de que una evidencia obtenida en la escena del crimen no arroje rastros de ADN de un sospechoso, no significa que la persona no hubiese estado en el lugar.[159] En fin, el Ministerio Público probó **todos** los elementos de los delitos (asesinato en primer grado, robo agravado, portación y uso ilegal de arma de fuego), y su conexión con el acusado que llevaron al juzgador a establecer su culpabilidad **más allá de duda razonable**.

En consecuencia, concluimos que no han mediado las circunstancias que nos permitirían intervenir con la apreciación de la prueba realizada por el juzgador; máxime, en ausencia de *pasión, prejuicio, parcialidad o error manifiesto*, no variaremos el dictamen apelado.

**-IV-**

Por lo fundamentos antes expuestos, se **confirma** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[159] *TPO*, a la págs. 485 – 487; y las págs. 503 - 505